**Dennis RUTHERFORD, et al.,
Plaintiffs-Appellees,**

v.

**Peter J. PITCHESS, et al.,
Defendants-Appellants.**

**No. 81–5461.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Dec. 7, 1982.

Decided July 14, 1983.

Certiorari Granted Nov. 7, 1983.
See 104 S.Ct. 390.

Terry Smerling, American Civil Liberties Union of Southern California, Los Angeles, Cal., for plaintiffs-appellees.

Frederick R. Bennett, Deputy County Counsel, Los Angeles, Cal., for defendants-appellants.

Before TANG, SCHROEDER, and POOLE, Circuit Judges.

SCHROEDER, Circuit Judge:

This is a class action against Los Angeles County officials [1] on behalf of pretrial detainees in the Los Angeles County Central Jail. After trial the district court ordered twelve different changes in jail conditions. The county accepted nine of those changes which covered a variety of problems, including overcrowding, inadequate exercise, lack of clean clothing and telephone access, and insufficient time to eat meals. It appealed the remaining three.

1. Named as defendants in this action are: Los Angeles County Sheriff Peter J. Pitchess; County Corrections Chief John Knox; Central Jail Commander James White; and Los Angeles County Supervisors Edward Edelman, Kenneth Hahn, James Hayes, Peter Schabarum, and Baxter Ward. We refer to these defendants collectively as "the county."

In an earlier unpublished memorandum decision, we remanded the case to allow the district court to reconsider the three challenged orders in the light of the intervening Supreme Court decision in *Bell v. Wolfish,* 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979) (*Wolfish*). On remand, the district court acknowledged that *Wolfish* required some differences in analysis, but concluded that it required no difference in result. The court reaffirmed its previous order with respect to all three conditions. The county again appeals.

The challenged orders, which have been stayed pending appeal, require that the jail administrators: (1) allow low-risk detainees who are imprisoned for more than one month to receive one contact visit per week, up to a maximum of 1,500 such visits per week; (2) permit inmates to observe searches of their cells; and (3) reinstall transparent windows in the cells.[2] We reverse the order requiring reinstallation of windows and affirm the other two.

## I

### *The Legal Standards*

The district court's original orders were entered in 1979 after a seventeen-day court trial and two personal inspections of the jail. Judge Gray explained his rulings in two memoranda of decision, both of which reflected the court's consideration of relevant aspects of the detainees' confinement, including whether the challenged restrictions were reasonably necessary to the maintenance of security, order, and safety in the institution.

In our decision remanding the case in light of *Wolfish,* we summarized the standards which the district court should apply:

> *Bell v. Wolfish,* 441 U.S. 520 [99 S.Ct. 1861, 60 L.Ed.2d 447] (1979), . . . set forth two tests for evaluating constitutional attacks by pretrial detainees on conditions and restrictions during their confinement. Where a condition implicates the fourteenth amendment's protection against deprivation of liberty without due process, the proper inquiry is whether the condition amounts to punishment. *Id.* at 538 [99 S.Ct. at 1873]. A condition is punitive if there is a showing of express intent to punish. Otherwise, if a particular condition is reasonably related to a legitimate nonpunitive objective, it does not, without more, amount to punishment. *Id.* Legitimate objectives include both insuring the detainee's presence at trial and facilitating the effective management of the facility. *Id.* at 539–40 [99 S.Ct. at 1874].
>
> Where a restriction implicates another constitutional right as well, a court must assess whether the condition or restriction impermissibly infringes that right. In making that assessment, however, the court must recognize that the essential goals of maintaining security and preserving internal order and discipline may require some limitation on the constitutional rights of detainees, *id.* at 546 [99 S.Ct. at 1877], and must grant wide-ranging deference to prison administrators in

2. The exact language of the challenged orders is as follows:

2. (b) *Contract Visits.* Commencing not more than ninety days following the date of this order, the defendants will make available a contact visit once each week to each pretrial detainee that has been held in the jail for one month or more, and concerning whom there is no indication of drug or escape propensities; provided, however, that no more than fifteen hundred such visits need be allowed in any one week. In the event that the number of requested visits in any week exceeds fifteen hundred, or such higher number as the Sheriff voluntarily undertakes to accommodate, a reasonable system of rotation or other priorities may be maintained. The lengths of such visits shall remain in the discretion of the Sheriff.

5. *Restoration Of Windows.* Within ninety days following the filing of this order, transparent windows shall be restored in each portion of the jail from which they previously have been removed.

8. *Cell Searches.* Inmates that are in the general area when a 'shakedown' inspection of their cells is undertaken shall be permitted to be sufficiently proximate to their respective cells that they may observe the process and respond to such questions or make such requests as circumstances may indicate.

the adoption of policies to serve these goals. *Id.* at 547–58 [99 S.Ct. at 1878]. *Rutherford v. Pitchess,* 626 F.2d 866, slip op. at 2–3 (9th Cir.1980) (mem.). We commented upon the relationship between the analysis used by the district court in this case and the Supreme Court in *Wolfish* as follows:

> The district court here articulated standards that track closely those the Supreme Court subsequently laid down in *Wolfish.* Relying on case law to the date of its decision, however, the district court also observed that proof of the availability of less restrictive means demonstrated that prison officials had exaggerated their response to security concerns. *Wolfish* rejected this mode of analysis. *Id.*

*Id.* at 3. On remand, Judge Gray reaffirmed his prior orders, stating that the county's actions "exceeded the reasonable requirements of security."

■ We review the district court's decision upon remand in light of the controlling authority and our earlier mandate. In doing so, we recognize that the authority to make policy choices concerning prisons is not a proper judicial function. *Wolfish, supra,* 441 U.S. at 562, 99 S.Ct. at 1886. Nevertheless, we also are conscious of the fact that pre-trial detainees, who have not been convicted of any crime, retain important constitutional rights which must be protected.

■ A court confronted with challenges to prison practices therefore faces an important and difficult task. To fulfill the Supreme Court's mandate under *Wolfish,* it must explore and analyze two ofttimes competing sets of needs and objectives—the penal institution's interest in institutional administration and security and the detainee's interest in protecting and exercising his retained constitutional rights. Only after such a thorough review can a court decide whether or not a particular prison condition is an unreasonable, exaggerated response to the legitimate nonpunitive objectives of a detention facility.

Here, the trial court's factual findings are for the most part not challenged by the county and we defer to those findings as they have not been shown to be clearly erroneous. Fed.R.Civ.P. 52(a). The county assails the court's application of the appropriate legal standards to the conditions existing at the prison. These legal conclusions are, of course, subject to de novo review. *Hoptowit v. Ray,* 682 F.2d 1237, 1245 (9th Cir.1982). We consider, in turn, each challenged order.

## II

### Contact Visits

■ The district court found that the county denies all detainees the opportunity for physical contact with their visitors. The inmates are separated from their visitors by transparent glass and must use a "telephone" for voice communication.

In considering the appellees' challenge to this practice, the district court rejected any contention that unlimited contact visits should be provided, concluding that if contact were permitted in all visits, an enormous security burden would result and the total number of visits, given the physical limitations of L.A. County Jail, would have to be reduced. At the same time, the court was concerned with the adverse psychological effects caused by the lack of physical contact with family members over a prolonged period of time. Such effects are supported by the evidence in this record and have been noted by other district courts confronting similar challenges. *See, e.g., Rhem v. Malcolm,* 371 F.Supp. 594, 601–07 (S.D.N.Y.), *aff'd,* 507 F.2d 333 (2d Cir.1974).

The court carefully reviewed the particular security problems that contact visitation engenders, including the risks of physical harm and escape, as well as of the importation of contraband such as drugs and weapons. It also considered the short length of time that most detainees spend at this particular facility. After this thorough analysis, the court concluded that the loss of contact over a prolonged period was an unreasonable and exaggerated response by the county for those detainees who spend

more than thirty days in the facility and who can be identified as low-risk detainees. The court therefore entered a narrow order providing for one contact visit per week for such detainees and for a maximum number of contact visits per week in the institution. The court found that only modest physical alterations would be necessary to permit this small number of visits.[3]

The county argues in this appeal that the contact visitation order is improper because the district court relied on evidence of visitation practices in other county institutions in order to arrive at a "lowest common denominator." The Supreme Court in *Wolfish* stated that the Due Process Clause does not require such a security standard, "whereby a practice permitted at one penal institution must be permitted at all institutions." 441 U.S. at 554, 99 S.Ct. at 1882.

Our review of the district court's opinion, however, convinces us that Judge Gray fashioned a narrowly drawn order based upon the capacities, limitations, and security risks of this particular jail. In reaffirming his order on remand, Judge Gray noted that he had tried "to find the 'mutual accommodation between institutional needs and objectives and the provisions of the constitution that are of general application,' to which Justice Rehnquist referred in his opinion (441 U.S. at 546 [99 S.Ct. at 1877] )." He concluded that the "categorical rejection of all proposals involving [contact] visits" is not consistent with this approach. We agree with Judge Gray in this regard.

The district court's analysis in this case is fully consistent with the approach approved by the Fifth Circuit in *Jones v. Diamond,* 636 F.2d 1364, 1377–78 (5th Cir.) (en banc), *cert. dismissed,* 453 U.S. 950, 102 S.Ct. 27, 69 L.Ed.2d 1033 (1981). In *Diamond,* the Fifth Circuit held that the determination of whether contact visitation may be denied for legitimate security reasons is a decision peculiar to each penal institution: "Whether or not contact visitation rights should be accorded pretrial detainees in the Jackson County jail can be decided only after a full

hearing on the facilities available in both jails and the security requirements in each." 636 F.2d at 1377.

Nor is affirmance of the district court's order in conflict with other post-*Wolfish* circuit opinions which have disapproved of increased contact visitation. For example, in *Ramos v. Lamm,* 639 F.2d 559 (10th Cir.1980), *cert. denied,* 450 U.S. 1041, 101 S.Ct. 1759, 68 L.Ed.2d 239 (1981), the court of appeals refused to approve a district court decision ordering unrestricted contact visitation. However, the pre-existing prison facility policy in that case permitted even more liberal contact visitation than the order on review here; *all* inmates were allowed to kiss their visitors at the beginning and end of each visit, hold hands, and hold small children on their laps. The court of appeals deferred to this existing policy because "it is a reasonable response to the legitimate concerns of prison security." 639 F.2d at 580.

In *Jordan v. Wolke,* 615 F.2d 749 (7th Cir.1980), the court also refused to enforce a district court order requiring unrestricted contact visitation for all detainees. The court noted that only five percent of the detainees stayed in the facility for over thirty days, implicitly recognizing that different considerations may apply when courts consider requiring contact visits for long-term as opposed to short-term detainees. *See also* 1979 B.Y.U.L.Rev. 1022, 1034–35. Here, the record reflects that the percentage of long-term detainees in L.A. County Jail is considerably higher.

In *Inmates of Allegheny County Jail v. Pierce,* 612 F.2d 754 (3d Cir.1979), the court of appeals affirmed the district court's ruling that contact visitation could be prohibited. The district court's findings, which were held not to have been clearly erroneous, were based on the conditions and security problems existing at that particular institution.

■ The twin threads running through all these post-*Wolfish* cases are first, that

---

**3.** The maximum number of contact visits was set at 1,500. By contrast, the total number of visitors at Central Jail per week exceeds 15,-000.

contact visitation is not constitutionally mandated for all detainees in all facilities; and second, that the denial of all contact visitation is not per se beyond court scrutiny. The pattern which emerges is one which recognizes the important security interests of the institution but at the same time recognizes the psychological and punitive effects which the prolonged loss of contact visitation has upon detainees, who have not as yet been convicted of any crime. The institution's security interests do not always predominate. A blanket restriction on contact visits for all detainees may present an unreasonable, exaggerated response to security concerns at a particular facility. The district court's order here, granting a limited number of contact visits for only those who have been held more than thirty days and who do not constitute security risks, fits harmoniously within this pattern. We therefore affirm that order.

### III

### *Observation of Cell Searches*

The second challenged jail practice is that of conducting unannounced "shakedown" searches of cells outside the presence of the inmates. The need for such searches themselves is not at issue, only the need for conducting them in a manner which prevents the prisoner from observing the search.[4] The district court's order requires that individual inmates in the general area of their cells when a "shakedown" search occurs should be "near enough to observe the process and raise or answer any relevant inquiry."

Before entering this order, Judge Gray visited the prison and personally observed four alternative methods of conducting cell searches. As with the order regarding contact visits, Judge Gray carefully took into account the conditions at the facility and the security concerns expressed by prison officials, including the possibility that the prisoner's presence would disrupt the search or, more important, would frustrate it by

disclosing safe hiding places. He also considered the county's further argument that confrontation during searches would create security risks too costly to deal with.

In support of the plaintiffs, Judge Gray considered testimony and observed first-hand that the county's method of searching all the cells in a row while the inmates were contained in a day room, or elsewhere, presents its own risks. For example, prison officials may improperly confiscate the prisoner's meager possessions. The prisoners also objected that this practice encouraged officials to "tear their cells apart."

In analyzing the prison's procedure, Judge Gray recognized the competing needs and objectives of the parties, and therefore stated in his opinion that his order only required that individual inmates be brought to the cell area one at a time to observe the search of their respective cells. This procedure was designed to meet the plaintiffs' concerns and avoid confrontation and additional expense.

The county argues in this appeal, however, that the Supreme Court's decision in *Wolfish* forecloses any order which allows pre-trial detainees to observe cell searches because, in the county's view, *Wolfish* held that the practice of conducting searches outside of a detainee's presence is, in every instance, rationally related to legitimate security concerns. We disagree. While the court in *Wolfish* did reverse an order permitting inmates to observe shakedown searches of their cells, it did so because it concluded that a rule preventing observation does not, in itself, render a search "unreasonable" under the fourth amendment. 441 U.S. at 557, 99 S.Ct. at 1883–84. In our view this holding does not preclude an observation order based on the circumstances and evidence present here; there are significant differences between this case and *Wolfish*.

The challenged district court order in *Wolfish*, for example, failed to take into

---

4. Appellees concede that such searches are necessary to prevent the accumulation of contraband and other items not allowed in the

cells, such as food or excessive clothing and reading material, and to maintain the security of the facility.

account the concerns of prison officials that inmates could frustrate searches by "distracting personnel and moving contraband from one room to another ahead of the search team." 441 U.S. at 555, 99 S.Ct. at 1883. Here, by contrast, these concerns were clearly addressed by Judge Gray and taken into account in framing the cell search order. The order approves of the unannounced removal of inmates from their cells and their detention in the day room while the cell row is being searched. Individual detainees need only be brought back from the day room to observe the search of their own cell.

Another significant difference is that the lower court in *Wolfish* had taken the position that the searches infringed the detainees' interest in privacy and were "unreasonable" within the meaning of the fourth amendment. The Supreme Court sharply criticized this holding, stating that "[p]ermitting detainees to observe the searches does not lessen the invasion of their privacy...." 441 U.S. at 557, 99 S.Ct. at 1883. Here, however, in considering the Supreme Court's opinion in *Wolfish,* the district court emphasized that its order was not based solely upon fourth amendment concerns, but was, to a large extent, also based upon the protection of the inmates' right to due process of law under the fourteenth amendment. Judge Gray found, given all of the evidence before him, including his own observations in the prison, that the risks of improper confiscation of a detainee's few cherished possessions were great and could not be redressed in any action to recover the value of the articles taken.

The district court specifically referred to one incident which was significant to its conclusion that improper deprivations could only be avoided by injunctive relief. During the demonstration of one of the alternative methods of search conducted during the district court's visit, the deputy conducting the search started to confiscate a prisoner's magazines. Since in this alternative the prisoner was permitted to observe the search, he was able to explain to the deputy that the two magazines did not violate prison regulations on the currency and condition of magazines. Hence observation prevented the taking and destruction of materials valuable to a prisoner. As the district court observed: "[t]hese are small matters; but they are important to the detainees." Thus, Judge Gray concluded that "to allow these prized possessions to be confiscated under subjectively enforced regulations, without giving the possessor any opportunity to explain or protest or entreat, deprives him of his property without due process of law."

Nevertheless, the county still suggests that the district court's order cannot stand because, as a matter of law, language in a footnote of the *Wolfish* opinion prevents courts from examining the effect of search practices on property rights of inmates. *See* 441 U.S. at 558 n. 38, 99 S.Ct. at 1884.[5]

In our view the *Wolfish* footnote does not preclude such considerations; the lower courts in *Wolfish* had not even considered possible violations of property rights. The Court in this footnote merely points out that, even assuming that searches violate prisoner property rights, a wholesale challenge to a prison search policy must still be analyzed with reference to jail officials' concerns and judgments on security matters. The record in this case clearly reflects

---

**5.** The complete text of footnote 38 is as follows:

It may be that some guards have abused the trust reposed in them by failing to treat the personal possessions of inmates with appropriate respect. But, even assuming that in some instances these abuses of trust reached the level of constitutional violations, this is not an action to recover damages for damage to or destruction of particular items of property. This is a challenge to the room-search rule in its entirety, and the lower

courts have enjoined enforcement of the practice itself. When analyzed in this context, proper deference to the informed discretion of prison authorities demands that they, and not the courts, make the difficult judgments which reconcile conflicting claims affecting the security of the institution, the welfare of the prison staff, and the property rights of the detainees. *Jones v. North Carolina Prisoners' Labor Union,* 433 U.S. 119, 128, 97 S.Ct. 2532, 2539, 53 L.Ed.2d 629.

that Judge Gray, in fashioning his order modifying jail search practices, paid ample deference to the jail officials' concerns about security problems. We therefore uphold Judge Gray's order with respect to cell search procedures.

## IV

### Restoration of Windows

■ The last challenged order is Judge Gray's requirement that the county reinstall transparent windows in those portions of the jail which originally had such windows. Shortly after L.A. County Jail was constructed, the original windows, made of wired glass, were replaced. Eventually, currently existing concrete enclosures were put in to cover the openings. It is undisputed that these changes were brought about by the fact that many of the glass windows were broken by the inmates and thus seriously interfered with security at the facility. The county considered installing other transparent materials, but these were disapproved by the fire department due to fire hazard regulations.

Plaintiffs argue that they have a psychological need for exposure to the outside world and that the lack of windows along with other conditions at the jail, including inadequate rooftop exercise time, overcrowding, and the lack of indoor recreational facilities, coalesced to create a punitive atmosphere violative of due process. They allege that Judge Gray's order to restore the windows is designed, in part, to compensate for his refusal to issue comprehensive orders regarding other aspects of the jail's conditions.

Judge Gray's order was based on the ground that "the [inmates'] right not to be deprived of all view of the outside world far outweighs the inferred danger of serious escape attempts or contraband importation. . . ." This conclusion was premised on his opinion that, given the physical layout of the jail and windows, and the intense supervision provided, the possibility of escape was remote and prison officials could use their "resourcefulness" to prevent contraband importation. Judge Gray also was

not convinced that the county had made a complete search for transparent plastic windows that would comply with fire safety standards. On remand, Judge Gray likened the lack of windows to "loading a detainee with chains and shackles and throwing him in a dungeon. . . ." *See Wolfish, supra,* 441 U.S. at 539 n. 20, 99 S.Ct. at 1874. Although he did not find any express intent to punish, he concluded, in effect, that such an intent could be inferred.

The difficulty with Judge Gray's order and his explicative reasoning is that it fails to account for the jail's history of very real and serious security problems with respect to windows, a history which is not challenged by the appellees. Uncontroverted evidence shows that every measure attempted prior to the installation of the concrete enclosures proved unsatisfactory. When the broken wired glass windows were replaced, first by steel screens and then by steel plates, both the screens and plates were torn down by the inmates, and the security problems concerning escape and access to contraband continued.

Nor does the order adequately address the testimony presented by the county that "non-breakable" glass is unsuitable in that it can, in fact, be broken by objects available to the inmates and that the material used in other transparent plastic windows will not meet fire regulations. Without the appropriate findings and evidence to support them, the concrete windows cannot be characterized as an "exaggerated response" by county officials in this case. *See Wolfish, supra,* 441 U.S. at 561–62, 99 S.Ct. at 1885–86; *cf. Hoptowit v. Ray, supra,* 682 F.2d at 1246–47 (totality of conditions may not justify relief which must be based on showing of independent constitutional violation), *citing Wright v. Rushen,* 642 F.2d 1129, 1132–33 (9th Cir.1981). Since the record contains no indication that, given the security problems attendant to the use of windows in this facility, any more appropriate response exists, we must conclude that the county's action with respect to the windows was justified by legitimate security objectives. The district court therefore erred in requiring reinstallation of transparent windows.

## V

### Conclusion

We have carefully and thoroughly reviewed the district court's orders to determine, in each instance, whether the standards set forth by the Supreme Court in *Wolfish* properly were followed. The orders with respect to contact visitation and cell searches are affirmed. The order with respect to transparent windows is reversed. Each party is to bear its own costs.

POOLE, Circuit Judge, concurring in part and dissenting in part:

Because I believe that the outcome is controlled by *Bell v. Wolfish,* 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979) ("*Wolfish* "), I dissent from part III of this opinion, concerning prisoner observation of cell searches. I concur in the remaining portions of the opinion.

The majority seeks to find a distinction between this case and the situation in *Wolfish,* insofar as both consider the problems posed by cell "shakedowns." A fair reading of the Supreme Court's holding in *Wolfish* would not permit a distinction as to the meaning to be drawn. In *Wolfish,* the prison officials established a policy which did not permit prisoners to observe the searches of their cells, citing security concerns and a fear that the prisoners would be able to evade or frustrate the searches. *Id.* at 555, 99 S.Ct. at 1882. The prisoners objected because they suspected the guards of theft. *Id.* at 556, 99 S.Ct. at 1883. In the present case, the identical policy had been adopted by the jail officials, citing the same security and evasion concerns; the prisoners object essentially because they fear the improper confiscation of their property.

Faced with the competing concerns which underlay the search policy and the objections thereto, the Court held that the policy should not be enjoined, stating:

> ... proper deference to the informed discretion of prison authorities demands that they, and not the courts, make the difficult judgments which reconcile conflicting claims affecting the security of

the institution, the welfare of the prison staff, and the property rights of the detainees.

*Id.* at 557 n. 38, 99 S.Ct. at 1883 n. 38 (citations omitted). The Court's language could hardly be more clear, and there is no basis for holding that it does not provide controlling guidance in this case.

The distinctions relied upon by the majority are, I believe, without substance. First, it is claimed that the district court in *Wolfish* failed to weigh the prison official's security and evasion concerns in framing its order. Since the district judge in this case did expressly address those concerns, his order—essentially the same as that issued by the district court in *Wolfish* —is thought to be permissible. However, it is factually inaccurate to state that the district court in *Wolfish* did not also weigh those concerns. *See United States ex rel. Wolfish v. Levi,* 439 F.Supp. 114, 148–49 (S.D.N.Y.1977).

A second basis for distinguishing *Bell v. Wolfish* cited by the majority is that the constitutional basis for invalidating the search policy relied upon by the district and appellate courts in that case was limited to privacy and fourth amendment concerns. In the case at bar, the majority notes, the district court found a due process claim grounded in the improper confiscation of prisoners' property. Again, this distinction is strained, to say the least. While the district court in *Wolfish* confined its constitutional discussion to fourth amendment concerns, both that court and the Second Circuit on appeal stressed that the primary concern of the prisoners was the potential theft of their property—the same, allegedly new concern raised by Judge Gray here. *See* 439 F.Supp. at 148–49; 573 F.2d at 131. Further, the Second Circuit in *Wolfish* explicitly noted that the cell searches could give rise to a due process claim in certain circumstances. *See* 573 F.2d at 131 n. 29 (due process requires that receipts be given for property seized during cell searches).

Further, in *Wolfish* the Court determined that injunctive relief barring cell searches unless the prisoner was permitted to observe the search was improper when the concern was the possible theft of property.

The Court suggested instead that actions for damages were the proper remedy, *even if the thefts rose to the level of constitutional violations. See* 441 U.S. at 557 n. 38, 99 S.Ct. at 1883 n. 38. This, of course, reflects the traditional doctrine that injunctive relief is inappropriate unless there has been a showing that legal remedies are inadequate. *Beacon Theatres v. Westover,* 359 U.S. 500, 506–07, 79 S.Ct. 948, 954, 3 L.Ed.2d 988 (1959). But even if the potentially repetitive incidence of violations of personal property rights could under some circumstances warrant injunctive relief, the Supreme Court has told us, on facts almost exactly similar to those found here, that this cell-search practice violates no constitutional provision and should not be conditioned on the inmate's physical presence. *Bell v. Wolfish,* 441 U.S. at 555–557, 99 S.Ct. at 1882–83.

The district court in *Wolfish* and Judge Gray here considered the same concerns of the correctional officials and the inmates, and ordered the same injunctive relief. The Supreme Court rejected that approach in *Wolfish,* and our obligation now must be to heed the plain language of the Supreme Court's ruling and to reverse the order issued by the district court.