Robert E. THOMPSON,
Plaintiff–Appellant,

v.

CITY OF LOS ANGELES, Defendant,

and

County of Los Angeles, University of California at Los Angeles, Defendants–Appellees.

No. 88–5943.

United States Court of Appeals,
Ninth Circuit.

Submitted Feb. 8, 1989 *.

Decided Sept. 18, 1989.

---

\* The panel finds this case appropriate for submission without oral argument pursuant to Ninth Circuit Rule 34–4 and Fed.R.App.P. 34(a).

Robert E. Thompson, Hollywood, Cal., in pro per.

Kevin C. Brazile, Deputy County Counsel, Los Angeles, Cal., for defendant-appellee County of Los Angeles.

Eric S. Oto, Cotkin, Collins & Franscell, Los Angeles, Cal., for defendant-appellee Board of Regents of the University of California.

Before FARRIS, FERGUSON and BEEZER, Circuit Judges.

FERGUSON, Circuit Judge:

Plaintiff–Appellant Robert E. Thompson appeals *pro se* the district court's dismissal of his civil rights action as to defendant Board of Regents of the University of California and the district court's grant of summary judgment in favor of the County of Los Angeles. Thompson's complaint alleged he was not promptly arraigned after his warrantless arrest in violation of his Fourth Amendment rights, and that prior to his unconditional release from jail more than five days after his arrest, he was subjected to unconstitutional prison procedures and conditions in violation of his Fourth Amendment rights and due process rights under the Fourteenth Amendment. We affirm in part and reverse in part.

I.

On the evening of Thursday, July 18, 1985, a UCLA police officer observed an automobile with out-of-date registration tags parked at an expired parking meter. A check of the vehicle's license plate through the police communication system revealed that the automobile had been reported stolen. At about 8:40 p.m., Thompson entered the vehicle. As he began to drive away, he was immediately stopped by UCLA police officers and arrested for grand theft auto. While in the custody of

the UCLA Police, Thompson was finger-printed, photographed, and booked.

Soon after his arrest by the UCLA Police, Thompson was transported to the West Hollywood Sheriff's Station, where he was again booked and charged. Thompson remained at the West Hollywood Sheriff's Station until the morning of July 19, 1985. He was then transferred to the Los Angeles County Central Jail [hereinafter "County Jail"]. Upon entering the County Jail, Thompson, in accordance with the County of Los Angeles policy, was subjected to x-rays, a blood test, and a strip search. While in the County Jail, Thompson also alleged that he was forced to spend two nights on the floor of a prison cell without a mattress. On the morning of Wednesday, July 24, 1985, Thompson was unconditionally released from county jail; he was never arraigned for grand theft auto or any other charge.

On January 6, 1986, Thompson filed a complaint under 42 U.S.C. §§ 1983, 1981, and 1985 against the City of Los Angeles, the County of Los Angeles [hereinafter "the County"], Full–Service Car Rental System, and the Regents of the University of California at Los Angeles [hereinafter "UC"]. While Thompson named no individual defendants, he did include Does 1–20 as defendants.

Thompson's civil rights complaint alleged, *inter alia*, that both UC and the County had violated his Fourth Amendment rights by failing to arraign or release him within a reasonable period following his warrantless arrest, that the forced submission to x-rays, a blood test, and strip search constituted an illegal search under the Fourth Amendment and violated his Fourteenth Amendment right to due process of law, and that the County's failure to provide him with a bed in the County Jail constituted a deprivation of his Fourteenth Amendment rights.[1]

The district court subsequently disposed of all of Thompson's claims in favor of all named defendants. Specifically, with respect to Thompson's allegations against UC, the district court dismissed for failure to state a claim. As for the County, the district court initially denied the County's motion for judgment on the pleadings, but then subsequently granted the County's motion for summary judgment as to all causes of action.

## II.

A dismissal for failure to state a claim is a ruling on a question of law and is thus subject to de novo review. *Fort Vancouver Plywood Co. v. United States,* 747 F.2d 547, 552 (9th Cir.1984). A grant of summary judgment is also reviewed de novo. *Darring v. Kincheloe,* 783 F.2d 874, 876 (9th Cir.1986) (citing *Lojak v. Thomas,* 716 F.2d 675, 677 (9th Cir.1983). With respect to the entry of summary judgment, this court must determine, viewing the evidence in the light most favorable to the nonmoving party, whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law. *Ashton v. Cory,* 780 F.2d 816, 818 (9th Cir.1986).

## III.

The district court clearly did not err in dismissing all of Thompson's claims against UC since, as a state instrumentality for Eleventh Amendment purposes, it is not subject to a suit for damages under § 1983. Section 1983 provides, in relevant part, that "every person who subjects or causes to be subjected any citizen of the United States ... to the deprivation of any rights, privileges or immunities secured by the Constitution and laws, shall be liable to the party in an action at law, suit in equity or other proper proceeding to redress." Accordingly, only those governmental enti-

---

1. Thompson's civil rights complaint also alleged that the City of Los Angeles and Full–Service Car Rental System conspired amongst themselves and with the other defendants to deprive Thompson of his liberty and property without due process of law. These claims are not before us on appeal, however, as Thompson has explic-

itly abandoned all claims against Full Service Car Rental System and the City of Los Angeles. Also unchallenged on appeal is the district court's dismissal of Thompson's false arrest claim against UC and the district court's rejection of §§ 1981 and 1985 as valid bases for relief in this action.

ties which are "persons" within the meaning of § 1983 can be held liable under § 1983. While it is well-settled that local governmental bodies such as municipalities and counties are "persons" within the meaning of § 1983, *see Monell v. New York City Dep't of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), the Supreme Court recently declared that "States or governmental entities that are considered 'arms of the state' for Eleventh Amendment purposes" are not persons within the meaning of § 1983. *Will v. Michigan Dep't of State Police,* — U.S. ——, 109 S.Ct. 2304, 2311, 105 L.Ed.2d 45 (1989).

It has long been established that UC is an instrumentality of the state for purposes of the Eleventh Amendment. *Hamilton v. Regents,* 293 U.S. 245, 257, 55 S.Ct. 197, 201–02, 79 L.Ed. 343 (1934); *Jackson v. Hayakawa,* 682 F.2d 1344, 1350 (9th Cir.1982); *In re Holoholo,* 512 F.Supp. 889, 395 (D.Haw.1981). Since UC is an arm of the state under the Eleventh Amendment, it follows from *Will* that UC is not a "person" within the meaning of § 1983. Accordingly, the district court's dismissal of Thompson's § 1983 claims against UC must be affirmed.

### IV.

Before discussing Thompson's individual constitutional claims against the County, we first shall review briefly the general principles governing § 1983 actions against local governmental entities. As noted above, the Supreme Court in *Monell* held that local governmental bodies, such as counties, are persons under § 1983 and therefore may be sued under the statute for constitutional injuries. *Monell* went on to state, however, that a local governmental body cannot be found liable under § 1983 on a respondeat superior theory; liability may be imposed only if the plaintiff establishes that his injuries were inflicted pursuant to an official county policy or custom. *See Monell,* 436 U.S. at 690–94, 98 S.Ct. at 2035–38; *Gobel v. Maricopa County,* 867 F.2d 1201, 1206 (9th Cir.1989).

█ While a rule or regulation promulgated, adopted, or ratified by a local governmental entity's legislative body unquestionably satisfies *Monell*'s policy requirement, *see Monell,* 436 U.S. at 690, 98 S.Ct. at 2035–36, a "policy" within the meaning of § 1983 is not limited to official legislative action. Indeed, a decision properly made by a local governmental entity's authorized decisionmaker—i.e., an official who "possesses final authority to establish [local government] policy with respect to the [challenged] action"—may constitute official policy. *Pembaur v. City of Cincinnati,* 475 U.S. 469, 481, 106 S.Ct. 1292, 1299, 89 L.Ed.2d 452 (1986) (plurality opinion). "Authority to make municipal policy may be granted directly by legislative enactment or may be delegated by an official who possesses such authority, and of course whether an official had final policy-making authority is a question of state law." *City of St. Louis v. Praprotnik,* 485 U.S. 112, 108 S.Ct. 915, 924, 99 L.Ed.2d 107 (1988) (plurality opinion) (quoting *Pembaur,* 475 U.S. at 483, 106 S.Ct. at 1300).[2]

With respect to custom, the Court in *Monell* asserted that "although the touchstone of the § 1983 action against a government body is an allegation that official policy is responsible for a deprivation of rights protected by the Constitution, local governments ... by the very terms of the statute, may be sued for constitutional deprivations visited pursuant to governmental 'custom' even though such a custom has not received formal approval through the body's official decision-making channels." *Monell,* 436 U.S. at 690–91, 98 S.Ct. at 2035–36. Consistent with the commonly

---

**2.** As has been noted by this court in the past, the concurrence in *Praprotnik* disagrees with the plurality's conclusion that the policymaker inquiry is purely a question of state law. *See Gobel,* 867 F.2d at 1207 n. 12; *Hammond v. County of Madera,* 859 F.2d 797, 802 n. 1 (9th Cir.1988). The concurrence reasoned that state statutory law alone will frequently fail to disclose the reality of a municipality's power structure. *Praprotnik,* 108 S.Ct. at 934 (Brennen, J., concurring). Accordingly, it asserted that state law should only serve as a starting point in identifying official policymakers, and courts should be permitted to consider extrastatutory evidence in determining who possessed final policymaking authority in a particular case. *Id.* Like previous cases, the facts at issue here do not compel us to choose sides in this dispute.

understood meaning of custom, proof of random acts or isolated events are insufficient to establish custom. *Palmer v. City of San Antonio,* 810 F.2d 514, 516 (5th Cir.1987); *Depew v. City of St. Mary's,* 787 F.2d 1496, 1499 (11th Cir.1986). Only if a plaintiff shows that his injury resulted from a "permanent and well-settled" practice may liability attach for injury resulting from a local government custom. *See Praprotnik,* 108 S.Ct. at 926 (quoting *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 168, 90 S.Ct. 1598, 1614, 26 L.Ed.2d 142 (1970) ("a plaintiff may be able to prove the existence of a widespread practice that, although not authorized by written law or express municipal policy, is 'so permanent and well-settled as to constitute a custom or usage with the force of law' ").

If such a showing is made, however, a local government may be liable for its custom irrespective of whether official policymakers had actual knowledge of the practice at issue. The existence of custom as a basis for liability under § 1983 thus serves a critical role in insuring that local government entities are held responsible for widespread abuses or practices that cannot be affirmatively attributed to the decisions or ratification of an official government policymaker but are so pervasive as to have the force of law. *See id.*

### A.

With these principles in mind, we turn our attention to Thompson's individual constitutional claims against the County to determine whether the district court properly granted summary judgment in the County's favor.

■ Thompson first claims that his prolonged detention of more than five days without a probable cause determination violated his Fourth Amendment rights. While the record indicates that Thompson may indeed be correct that the County's failure to bring him before a judicial officer for a probable cause determination before his release from county jail violated his Fourth Amendment rights, *see Gerstein v. Pugh,*

420 U.S. 103, 125, 95 S.Ct. 854, 868–69, 43 L.Ed.2d 54 (1975) (Fourth Amendment requires that determination of probable cause "be made by a judicial officer either before or promptly after arrest"); *Bernard v. City of Palo Alto,* 699 F.2d 1023, 1025 (9th Cir.1983) ("Detention for less than 24 hours without a probable cause hearing would violate the Constitution in a particular case if the circumstances were such that the administrative steps leading to a magistrate's determination reasonably could have been completed in less than 24 hours."); *Llaguna v. Mingey,* 763 F.2d 1560, 1568 (7th Cir.1985) (en banc) (police officers liable for holding arrestee in jail for 42 hours without probable cause determination where such a period exceeded the administrative time necessary to prepare for probable cause hearing); *see also Kanekoa v. City & County of Honolulu,* 879 F.2d 607 (9th Cir.1989), the district court properly dismissed this portion of Thompson's § 1983 action as he alleged no facts which suggested that the alleged constitutional deprivation occurred as the result of County policy or custom.

First, Thompson has failed to allege that the Sheriff of Los Angeles County, the county official that state law indicates is the official policymaker regarding arrestee detention in County Jail,[3] promulgated, adopted, or ratified a policy of holding arrestees for a period that exceeds the amount of time necessary to prepare for a probable cause determination. Nor does Thompson contend that any other County officials acting pursuant to delegated official policymaking authority adopted such a policy.

Moreover, Thompson does not allege that the Sheriff, or an official delegated authority by the Sheriff, made or ratified any decisions concerning the length of his particular detention. Thompson also makes no reference to a decision or policy enactment by any other county official who could conceivably be regarded as an official policymaker regarding arrestee detention. Final-

---

**3.** Cal.Gov't Code § 26605 provides that "[t]he sheriff shall take charge of and keep the county jail and the prisoners in it." *See also Brandt v. Board of Supervisors,* 84 Cal.App.3d 598, 601,

147 Cal.Rptr. 468, 470 (1978) ("The responsibility for operating jails in this state is placed by law upon the Sheriff.")

ly, Thompson has failed to offer any evidence that the County maintains a custom of detaining arrestees for an excessive period of time prior to arraignment or release. Accordingly, liability may not be imposed against the County for its alleged constitutional deprivation. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986) (entry of summary judgment is mandated by Rule 56(c) if the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial").

### B.

Thompson next challenges his forced submission at the county jail to a strip search, x-rays, and a blood test. He contends that each of these procedures constituted unlawful searches in violation of the Fourth Amendment and violated his right to due process of law guaranteed by the Fourteenth Amendment.

The County concedes that as a matter of County policy, all new admittees to the county jail must undergo a strip search, x-ray, and blood sample. That being conceded, our task is to determine whether these policies, in the context of the particular circumstances of this case, raise factual issues sufficient to preclude summary judgment.

In recognition of the principle that pretrial detainees retain their Fourth Amendment rights within the jailhouse walls, the Supreme Court has held that searches of pretrial detainees in jail must be reasonable within the meaning of the Fourth Amendment. *Bell v. Wolfish,* 441

U.S. 520, 558, 99 S.Ct. 1861, 1884, 60 L.Ed.2d 447 (1979). To evaluate the reasonableness of the search challenged in *Bell,* the Court employed a balancing test which has now become a centerpiece of Fourth Amendment analysis in the prison context:

> The test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application. In each case it requires a balancing of the need for the particular search against the invasion of personal rights that the search entails. Courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted.

*Id.* at 559, 99 S.Ct. at 1884. *See Michenfelder v. Sumner,* 860 F.2d 328, 332 (9th Cir.1988) (*Bell* reasonableness standard applied to determine constitutionality of policy requiring visual body cavity searches whenever an inmate leaves or returns to maximum security unit);[4] *Giles v. Ackerman,* 746 F.2d 614, 617 (9th Cir.1984) (*Bell* standard employed in deciding validity of automatic strip search policy as applied to arrestees for traffic violations and other minor offenses), *cert. denied,* 471 U.S. 1053, 105 S.Ct. 2114, 85 L.Ed.2d 479 (1985); *Weber v. Dell,* 804 F.2d 796, 800 (2d Cir. 1986) (*Bell* test applicable in case challenging constitutionality of automatic strip body cavity searches of arrestees charged with misdemeanors or other minor offenses), *cert. denied,* 483 U.S. 1020, 107 S.Ct. 3263, 97 L.Ed.2d 762 (1987); *Hill v. Bogans,* 735 F.2d 391, 393–94 (10th Cir. 1984) (*Bell* proper standard to determine whether strip search of traffic offender,

---

4. In *Michenfelder,* we found that the standard announced by the Court in *Turner v. Safley,* 482 U.S. 78, 107, 107 S.Ct. 2254, 2271, 96 L.Ed.2d 64 (1987), that a prison regulation which "impinges on inmates' constitutional rights is valid if it is reasonably related to legitimate penological interests," is generally applicable to cases involving other prisoners' constitutional rights as well. *Michenfelder,* 860 F.2d at 331. Prior to *Michenfelder,* we had applied the *Turner* standard only in cases involving the alleged infringement of First Amendment rights. *See e.g., Reimers v. Oregon,* 846 F.2d 561, 562–63 (9th Cir.1988); *McElyea v. Babbitt,* 833 F.2d 196, 197 (9th Cir.

1987). *Michenfelder* involved a prisoner's challenge to, among other things, a jail policy of strip searching inmates housed in the maximum security unit every time such inmates left or returned to the unit. In assessing whether the challenged strip search of maximum security prisoners violated *Turner*'s "reasonable relationship" test, *Michenfelder* primarily employed the factors set forth in *Bell*'s Fourth Amendment reasonableness standard. Thus, *Michenfelder,* like all the cases cited below, supports application of the *Bell* reasonableness standard in this case.

without reasonable suspicion of concealment of contraband, contravenes Fourth Amendment principles); *Mary Beth G. v. City of Chicago,* 723 F.2d 1263, 1271 (7th Cir.1983) (*Bell*'s Fourth Amendment test applied to determine validity of strip/body cavity searches of women arrested for misdemeanor offenses).

Upon balancing *Bell*'s factors, we conclude that none of the County's search policies violated Thompson's rights. With respect to the strip search, the County's asserted justification for its policy—the prevention of the introduction of weapons or other contraband into the jail—is indeed an extremely weighty government interest. *See Bell,* 441 U.S. at 559, 99 S.Ct. at 1884–85 (prevention of smuggling of money, drugs, weapons, and other contraband is significant and legitimate prison security interest); *Mary Beth G.,* 723 F.2d at 1273 ("need to assure jail security is a legitimate and substantial concern"). On the other hand, the privacy interest at stake in a strip search, especially one including visual inspection of body cavities, cannot be understated.[5]

The feelings of humiliation and degradation associated with forcibly exposing one's nude body to strangers for visual inspection is beyond dispute. *See Giles,* 746 F.2d at 617 (parties do not dispute that strip search invaded plaintiff's privacy "in a frightening and humiliating manner"); *Tinetti v. Wittke,* 479 F.Supp. 486, 491 (E.D. Wis.1979) (strip searches involving visual inspection of anal and genital areas "demeaning, dehumanizing, undignified, humiliating"), *aff'd,* 620 F.2d 160 (7th Cir.1980) (per curiam).

In weighing these competing governmental and private interests, this court and several other courts have invalidated blanket visual strip search policies as applied to arrestees detained for minor traffic offenses and other misdemeanors not normally associated with weapons or other contraband. *See Weber,* 804 F.2d at 802 ("Fourth Amendment precludes prison officials from performing strip/body cavity searches of arrestees charged with misdemeanors or other minor offenses unless the officials have a reasonable suspicion that the arrestee is concealing weapons or other contraband"); *Jones v. Edwards,* 770 F.2d 739, 740–42 (8th Cir.1985) (strip/body cavity search of arrestee who refused to sign summons and allegedly resisted arrest unconstitutional); *Stewart v. Lubbock County,* 767 F.2d 153, 155–57 (5th Cir.1985) (reasonable suspicion standard did not justify strip searches of persons arrested for misdemeanors punishable only by fine), *cert. denied,* 475 U.S. 1066, 106 S.Ct. 1378, 89 L.Ed.2d 604 (1986); *Giles,* 746 F.2d at 617 (authorities must have reasonable individualized suspicion of concealment of contraband to strip search arrestees of traffic or of other minor violations); *Hill,* 735 F.2d at 393–95 (strip search of traffic offender unconstitutional where no reasonable suspicion that offender might have been concealing contraband); *Mary Beth G.,* 723 F.2d at 1263 (policy calling for strip/body cavity searches of women arrested for misdemeanor offenses unconstitutional); *Logan v. Shealy,* 660 F.2d 1007, 1013 (4th Cir. 1981) (strip search of DWI arrestee unconstitutional), *cert. denied,* 455 U.S. 942, 102 S.Ct. 1435, 71 L.Ed.2d 653 (1982). Courts invalidating strip search policies as applied to traffic and other non-violent offenders have generally held that in order to strip search such arrestees, the arresting officers must have reasonable individualized suspicion that an arrestee is carrying or concealing contraband. *See e.g., Giles,* 746 F.2d at 617; *Weber,* 804 F.2d at 802; *Mary Beth G.,* 723 F.2d at 1273. Individualized suspicion sufficient to warrant a strip search of such detainees may be based on such factors as "the nature of the offense, the arrestee's appearance and conduct, and the prior arrest record." *Giles,* 746 F.2d at 617; *see also Weber,* 804 F.2d at 802.

The Sixth Circuit has, in contrast, upheld the strip search of an arrestee charged with the misdemeanor offense of menacing, *Dobrowolskyj v. Jefferson County,* 823 F.2d 955, 957–59 (6th Cir.1987), *cert. denied,* —— U.S. ——, 108 S.Ct. 1012, 98

---

**5.** Thompson alleges that the strip search at the county jail included a visual inspection of his anal area. The County does not deny that the County strip search policy indeed calls for a body cavity inspection.

L.Ed.2d 978 (1988), and felonious assault, *Dufrin v. Spreen*, 712 F.2d 1084, 1089 (6th Cir.1983), based primarily on the fact that the charged offenses were sufficiently associated with violence and contraband and that the arrestees would be intermingled with the general jail population. *See also Masters v. Crouch*, 872 F.2d 1248, 1255 (6th Cir.1989) ("It is objectively reasonable to conduct a strip search of one charged with a crime of violence before that person comes into contact with other inmates.").

■ Although Thompson, like the arrestees in *Dobrowolskyj* and *Dufrin*, was placed into contact with the general jail population, such a factor by itself cannot justify a strip search. *See Giles*, 746 F.2d at 618 (fact that arrestee may ultimately be intermingled with general jail population does not, by itself, justify strip search as such intermingling is "both limited and avoidable"); *Masters*, 872 F.2d at 1254–55 ("the fact of intermingling alone has never been found to justify [a strip search] without consideration of the nature of the offense and the question of whether there is any reasonable basis for concern that the particular detainee will attempt to introduce weapons or other contraband into the institution"). Thus, the reasonableness determination in this case hinges upon the nature of the grand theft auto offense with which Thompson was charged. While it is difficult to place grand theft auto, a crime punishable as a felony offense under California law, *see* Cal.Veh.Code § 10851 (theft of automobile "punishable by imprisonment in the county jail for not more than one year or in the state prison ..."); Cal.Penal Code § 17 ("felony is a crime which is punishable with death or by imprisonment in the state prison"), on the continuum established by prior cases, we believe that,

on balance, such an offense is sufficiently associated with violence to justify a visual strip search.[6]

■ With respect to the County's other challenged searches, we openly acknowledge the serious intrusive nature of the extraction of blood from the person, *see Schmerber v. California*, 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966), and forced submission to radioactive rays, *see United States v. Ek*, 676 F.2d 379, 382 (9th Cir.1982) (while x-ray search may not be as humiliating as strip search, it "is more intrusive since the search is potentially harmful to the health of suspect"). We find, however, the County's interest of diagnosing severe medical problems to prevent transmission of serious disease among the general jail population is sufficiently compelling to preclude a finding that such searches are unreasonable within the meaning of the Fourth Amendment.[7] *See Wright v. Rushen*, 642 F.2d 1129, 1132–33 (9th Cir.1981) (jail officials have constitutional obligation to provide inmates with adequate medical care and personal safety).

■ Thompson's claim that the County's search policies offend due process also cannot withstand summary judgment. The *Bell* Court recognized that since a pretrial detainee may not be punished prior to an adjudication of guilt in accordance with due process of law, *see Bell*, 441 U.S. at 535, 99 S.Ct. at 1872, a court faced with a due process challenge to a particular regulation must determine whether the policy is imposed for the purpose of punishment or whether it is but an incident of some other legitimate governmental purpose. *Id.* at 538, 99 S.Ct. at 1873. The Court pronounced that "if a particular condition or

---

6. We emphasize, however, that our decision is extremely narrow and only applies to theft of an automobile; we express no opinion on the validity of a blanket strip search policy as applied to arrestees charged with other crimes against property, whether they be classified as felonies or misdemeanors.

7. A search that is in theory permissible in a particular context may in fact run afoul of the Fourth Amendment if conducted in an unnecessarily cruel, painful, or dangerous manner. *See Schmerber*, 384 U.S. at 768, 86 S.Ct. at 1834 (in

determining whether blood test after arrest driving under the influence of alcohol violated Fourth Amendment, must determine both whether police were justified in requiring blood test and whether "means and procedures employed in taking [defendant's] blood respected relevant Fourth Amendment standards of reasonableness"). Since Thompson raised no issue regarding the manner in which the challenged searches occurred, there exists no genuine issue of fact regarding whether the searches were indeed conducted in a humane, decent manner.

restriction of pretrial detention is reasonably related to a legitimate governmental objective, it does not, without [a showing of intent to punish on the part of prison or other government officials] amount to 'punishment.'" *Id.* at 539, 99 S.Ct. at 1874. As discussed above, all of the County's challenged procedures are reasonable responses to legitimate prison concerns. In the absence of any evidence suggesting that the County has adopted these procedures with an intent to punish pretrial detainees, the district court's entry of summary judgment on these claims must be affirmed.

C.

■ Thompson also alleges that the County failed to provide him with a bed or even a mattress for two of the nights spent in county jail and that consequently he was forced to sleep on the cement floor during those nights. He claims that such deprivation violated his right to due process guaranteed by the Fourteenth Amendment. The County does not deny Thompson's allegations that he was not provided with a bed or mattress during a portion of his stay at the county jail. Indeed, Thompson's allegations with respect to his sleeping conditions pass without reference or acknowledgement in the County's brief. We find the district erred in granting summary judgment on Thompson's constitutional challenge to the County's failure to provide him with a bed.

Applying *Bell*'s principle that conditions of incarceration serving no legitimate governmental objective constitute punishment of pretrial detainees in violation of the Fourteenth Amendment, *Bell*, 441 U.S. at 539, 99 S.Ct. at 1874 (if a "condition is not reasonably related to a legitimate goal ... a court may permissibly infer that the purpose of the government action is punishment"), several courts have held that a jail's failure to provide detainees with a mattress and bed or bunk runs afoul of the commands of the Fourteenth Amendment. *See Anela v. Wildwood*, 790 F.2d 1063, 1067 (3d Cir.) (allegation that City failed to provide bed or mattress to pretrial detainees states actionable constitutional claim), *cert. denied*, 479 U.S. 949, 107 S.Ct. 434, 93

L.Ed.2d 384 (1986); *Union County Jail Inmates v. Di Buono*, 713 F.2d 984, 996–97 (3d Cir.1983) (elimination of "unsanitary and humiliating" practice of forcing detainees to sleep on floor mattresses essential to bring jail up to minimum constitutional standards), *cert. denied*, 465 U.S. 1102, 104 S.Ct. 1600, 80 L.Ed.2d 130 (1984); *Lareau v. Manson*, 651 F.2d 96, 105 (2d Cir.1981) (prison's use of floor mattresses for pretrial detainees unconstitutional "without regard to the number of days for which a prisoner is so confined"); *Vazquez v. Gray*, 523 F.Supp. 1359, 1365 (S.D.N.Y.1981) (use of floor mattresses for pretrial detainees unconstitutional); *Martino v. Carey*, 563 F.Supp. 984, 1002 (D.Or.1983) (fact that jail overcrowding forced some pretrial detainees to sleep directly on floor contributed to finding that overcrowded conditions violated detainees' Fourteenth Amendment rights); *Stewart v. Gates*, 450 F.Supp. 583, 588 (C.D.Cal.1978) ("basic concepts of decency, as well as reasonable respect for constitutional rights, require that [each inmate] be provided a bed"); *Rutherford v. Pitchess*, 457 F.Supp. 104, 109 (C.D.Cal. 1978) (same), *aff'd in part and rev'd in part on other grounds*, 710 F.2d 572 (9th Cir.1983), *rev'd sub nom. Block v. Rutherford*, 468 U.S. 576, 104 S.Ct. 3227, 82 L.Ed.2d 438 (1984). Thus, Thompson's uncontroverted allegation that he was provided with neither a bed nor even a mattress unquestionably constitutes a cognizable Fourteenth Amendment claim.

■ As with his Fourth Amendment claim of prolonged detention without arraignment, Thompson has failed to offer any evidence showing that the County's failure to provide him with a bed was pursuant to County policy. He does, however, draw our attention to the case of *Rutherford v. Pitchess*, 457 F.Supp. 104, 109 (C.D. Cal.1978), which involved a constitutional attack on the conditions of Los Angeles County Men's County Jail, the facility at issue in this case. In *Rutherford*, the district court specifically found that because of frequent overcrowded conditions, the county jail was often not providing each inmate with a bed. *Id.* at 109. As noted above, the district court found such a situa-

tion inconsistent with due process and ordered the County to maintain the capability of providing each inmate with a bed. *Id.* at 110.

Thompson now alleges that in 1985, seven years after the *Rutherford* decision, the County again failed to provide a bed to each inmate. It is a bedrock common law principle that in certain situations, once a condition has been proven to exist, it is presumed in the absence of proof to the contrary that the condition has remained unchanged. 2 J. Wigmore, Wigmore on Evidence § 437 (J. Chadbourn rev. 1979). In light of the County's failure either to refute Thompson's allegation or to provide evidence of corrective measures taken to comply with the 1978 court order issued in *Rutherford*, it is appropriate to presume at this stage of the litigation that the relevant conditions declared unconstitutional in 1978 by the district court in *Rutherford* remained substandard at least through 1985. Therefore, we must also presume at this point that the County maintained a "custom" of unconstitutional jail conditions in the form of a shortage of beds and consequently may be held liable for Thompson's injuries resulting from such a constitutional deprivation. *See Anela,* 790 F.2d at 1069 (where evidence revealed long-standing condition of shortage of beds and mattresses in prison and City offered no evidence rebutting the absence of such items, the condition constituted a City custom such that City may be liable under *Monell*). Accordingly, the district court erred in entering summary judgment for the County on this issue.

Under Fed.R.Evid. 301, "a presumption imposes on the party against whom it is going forward with evidence to rebut or meet the presumption." Therefore, on remand, the County has the burden of coming forward with evidence that it remedied the bed shortage condition and thus that the failure to provide Thompson with a bed was a relatively isolated occurrence. The ultimate burden of proof, of course, remains on Thompson throughout the litigation. Fed.R.Evid. 301.

## V.

We affirm the district court's dismissal of all claims against UC. We also affirm the district court's entry of summary judgment in favor of the County as to all claims except for Thompson's allegation that the County failed to provide him with a mattress and bed. We reverse the district court's grant of summary of judgment on this claim and remand for further proceedings consistent with this opinion. The plaintiff is entitled to his costs.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.