**S.A. THOMAS, Plaintiff,**

v.

**Leroy BACA, Defendants.**

**No. CV 04–08448 DDP(SHX).**

United States District Court, C.D. California.

Sept. 21, 2007.

serve System.

Stephen Yagman, Marion R. Yagman, Joseph Reichmann, Yagman & Yagman & Reichmann, Venice Beach, CA, Prof. Erwin Chemerinsky, Duke Law School, Durham, NC, and Dean University of California at Irvine Richard Bren School of Law, Irvine, for Plaintiffs.

David D. Lawrence, Paul B. Beach, Justin W. Clark, Franscell, Strickland, Rob-

erts & Lawrence, Glendale, for Defendant Baca in his official and capacities.

ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFFS' RENEWED MOTION FOR SUMMARY ADJUDICATION AND GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, OR, IN THE ALTERNATIVE, SUMMARY ADJUDICATION

DEAN D. PREGERSON, District Judge.

This matter comes before the Court on Plaintiffs' and Defendant's cross-motions for summary adjudication. After reviewing the papers submitted by the parties and considering the arguments raised therein, the Court grants in part and denies in part Plaintiffs' motion and grants in part and denies in part Defendant's motion, and adopts the following order.

## I. PROCEDURAL HISTORY

S.A. Thomas and E.L. Gipson bring this class action under 42 U.S.C. § 1983 against Sheriff Leroy Baca in his official and individual capacities. The class includes pre-trial detainees and post-conviction prisoners who allege that they were required to sleep on the floor of Los Angeles County jail facilities in violation of their constitutional rights. The class is defined as "individuals who, while in Los Angeles Sheriff Department ("LASD") custody, were required to sleep on the floor of a LASD facility with or without bedding." (Order (1) Granting Mot. Class Cert. and (2) Granting Mot. Order Permit Ident. 15, May 17, 2005 ("Class Cert. Order").)[1] The dates of class membership are limited

from December 18, 2002, to May 17, 2005. (Order Denying Pls.' Mot. Class Not. 6–7, Dec. 20, 2005.) Individuals forced to sleep on the floor "between December 18, 2000, and December 17, 2002, and who remained in prison until at least December 18, 2002, are also included in the class." (*Id.* 6.)

Plaintiffs move for summary adjudication of three issues: (1) that there is a custom in the Los Angeles County jail system of requiring inmates to sleep overnight on the floor because there are insufficient available bunks; (2) that the custom is unconstitutional; and (3) that Sheriff Baca is legally responsible for the custom. (Pls.' Mot. for Summ. J. 1–2, May 24, 2006.) Defendant also moves for summary judgment or, in the alternative, summary adjudication. Defendant argues that he is entitled to summary judgment because (1) the conditions of confinement do not give rise to a constitutional violation; and (2) Defendant, in his individual capacity, is entitled to qualified immunity. (Def.'s Mot. for Summ. J. 1–2, June 28, 2006 ("Def.Mot.") 1.) The Court has concluded that Plaintiffs' are entitled to summary adjudication that 1) there was a custom during the class period of requiring inmates to sleep on the floor at LASD facilities, and 2) that the custom violates the Eighth and Fourteenth Amendments to the United State Constitution. The Court grants summary adjudication to Defendant on the question of qualified immunity.

## II. LEGAL STANDARD

### A. Summary Adjudication

Summary adjudication of an issue, like summary judgment, is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any materi-

---

1. The practice of requiring inmates to sleep on the floor will hereinafter be referred to as "floor-sleeping," as it is the term used by

LASD officials and inmates alike. For the same reason, inmates who sleep on the floor will be referred to as "floor sleepers."

al fact and that the moving party is entitled to a judgment as a matter of law" on that issue. Fed.R.Civ.P. 56(c). A genuine issue exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," and material facts are those "that might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In adjudicating a motion for summary judgment or summary adjudication, the court must draw all reasonable inferences in favor of the nonmoving party. *Id.* at 255, 106 S.Ct. 2505.

### B. *Monell Liability under § 1983*

█ Plaintiffs seek summary adjudication of issues related to their official capacity claims against the defendant. Official capacity suits provide "another way of pleading an action against an entity of which an officer is an agent." *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 n. 55, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Therefore, this suit against Sheriff Baca in his official capacity is to be treated as a suit against the County of Los Angeles.

█ The government as an entity is liable for the deprivation of a plaintiff's constitutional rights under § 1983 when "execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the [constitutional] injury." *Id.* at 694, 98 S.Ct. 2018. While a municipal entity may not be held liable through § 1983 under a respondeat superior theory, it may be found liable for a custom or persistent practice. *Id.* at 691, 694, 98 S.Ct. 2018.

█ Here, Plaintiffs seek to establish liability based upon a custom of requiring inmates to sleep on the floor. A practice that has not received formal approval by an appropriate decision-maker may fairly subject an entity to liability on the theory that the relevant practice is so "permanent and well settled as to constitute a custom or usage with the force of law." *Id.* at 691, 98 S.Ct. 2018 (internal quotation marks omitted). Because of the causation requirement implicit in § 1983, Plaintiffs must also establish that the custom is the "moving force" behind their constitutional injuries. *Bd. of the County Comm'rs v. Brown*, 520 U.S. 397, 404, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997).[2] A custom is the moving force behind a constitutional violation when it is "closely related to the ultimate injury" and when the plaintiff can "establish that the injury would have been avoided had proper policies been implemented." *Long v. County of L.A.*, 442 F.3d 1178, 1190 (9th Cir.2006) (internal quotation marks omitted).

### C. *Constitutional Framework*

██ Plaintiffs have asserted causes of action under both the Eighth and Four-

---

**2.** Defendant contends that, in addition to proving that the custom was the moving force behind their injuries, Plaintiffs must also show that it constitutes deliberate indifference on the part of the government entity in order to establish municipal liability. (Def.'s Mot. 1–2.) Not so. A plaintiff must demonstrate deliberate indifference when it seeks to hold a municipality liable for "failing to prevent a deprivation of federal rights." *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 291, 118 S.Ct. 1989, 141 L.Ed.2d 277 (1998). Here, by contrast, Plaintiffs argue that an *affirmative* custom exists of requiring pre-trial and post-conviction detainees to sleep on the floor. "Where a plaintiff claims that a particular municipal action itself violates federal law, or directs an employee to do so, ... [s]ection 1983 itself contains no state-of-mind requirement independent of that necessary to state a violation of the underlying federal right." *Brown,* 520 U.S. at 404–05, 117 S.Ct. 1382. Therefore, Plaintiffs need not show deliberate indifference to establish a threshold of potential liability under *Monell*. However, Plaintiffs must nonetheless "establish the state of mind required to prove the underlying violation." *Id.* at 405, 117 S.Ct. 1382.

teenth Amendments to the United States Constitution. This is because the Plaintiff class includes both pre-trial detainees and post-conviction inmates. Questions about the constitutionality of the conditions of pre-trial detainees "are properly addressed under the due process clause of the Fourteenth Amendment" because such individuals have not yet been convicted of any crime. *Or. Advocacy Center v. Mink,* 322 F.3d 1101, 1120 (9th Cir.2003); *see Bell v. Wolfish,* 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979). Questions involving the treatment of post-conviction prisoners are, by contrast, addressed under the Eighth Amendment. *See Farmer v. Brennan,* 511 U.S. 825, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). Because "the due process rights of pretrial detainees are 'at least as great as the Eighth Amendment protections available to a convicted prisoner,'" the Ninth Circuit has held that, "even though the pretrial detainees' rights arise under the Due Process Clause, the guarantees of the Eighth Amendment provide a minimum standard of care for determining their rights." *Mink,* 322 F.3d at 1120 (quoting *City of Revere v. Mass. Gen. Hosp.,* 463 U.S. 239, 244, 103 S.Ct. 2979, 77 L.Ed.2d 605 (1983)). As will be explained, the Court finds that the custom of floor sleeping in LASD facilities violates the Eighth Amendment. As the constitutional floor, an Eighth Amendment violation necessarily signifies a Fourteenth Amendment violation. Accordingly, the Court will rely on Eighth Amendment analysis.

■ The Eighth Amendment "prohibits the infliction of 'cruel and unusual punishments' on those convicted of crimes." *Wilson v. Seiter,* 501 U.S. 294, 297, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991) (quoting U.S.

Const. amend. VIII). The Supreme Court has held that this prohibition extends beyond physically barbarous punishments. *Estelle v. Gamble,* 429 U.S. 97, 102, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). Because the Eighth Amendment "embodies 'broad and idealistic concepts of dignity, civilized standards, humanity and decency,'" it proscribes punishments that are "incompatible with 'the evolving standards of decency that mark the progress of a maturing society.'" *Id.* (quoting *Trop v. Dulles,* 356 U.S. 86, 101, 78 S.Ct. 590, 2 L.Ed.2d 630 (1958)).

■ Establishing a violation has both an objective and a subjective prong. The objective prong requires that the "deprivation [be] sufficiently serious," because "only those deprivations denying the minimal civilized measure of life's necessities are sufficiently grave to form the basis of an Eighth Amendment violation." *Wilson,* 501 U.S. at 298, 111 S.Ct. 2321 (internal quotation marks and citation omitted). Such necessities include "adequate shelter, food, clothing, sanitation, medical care, and personal safety." *Johnson v. Lewis,* 217 F.3d 726, 731 (9th Cir.2000) (citing *Farmer v. Brennan,* 511 U.S. 825, 832, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994)).

■ Under the subjective prong, Plaintiffs must show that "the prison officials had a 'sufficiently culpable state of mind,' acting with deliberate indifference." *Hearns v. Terhune,* 413 F.3d 1036, 1040 (9th Cir.2005) (quoting *Farmer,* 511 U.S. at 834, 114 S.Ct. 1970). " 'Deliberate indifference entails something more than mere negligence but is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result.'" *Id.* (quoting *Farmer,* 511 U.S. at 834, 114 S.Ct. 1970) (internal alterations omitted).[3]

---

**3.** The deliberate indifference standard does not "govern[ ] the due process rights" of pre-trial detainees; instead, analyzing Due Pro-

cess claims requires courts to balance the interests of the detainees against the "legiti-

## III. DISCUSSION

### A. *Evidentiary Issues*

Before reaching the merits of Plaintiffs' constitutional claims, several evidentiary matters must be addressed. In support of their motion for summary judgment, Plaintiffs offer: (1) deposition transcripts of LASD officials; (2) an August 30, 2005 letter to an inmate signed by Captain Timothy C. Cornell; (3) a summary exhibit listing inmates who have provided information to Plaintiffs' counsel concerning their own floor-sleeping; (4) a summary exhibit listing floor sleepers from records provided to Plaintiffs by Defendant pursuant to this Court's orders; (5) Plaintiff Thomas's declaration; (6) declarations of inmates who claim they were forced to sleep on the floor while in LASD custody; (7) newspaper articles regarding floor-sleeping in LASD facilities; and (8) records produced by Defendant detailing 688 additional instances of floor sleeping in February 2006. Defendant also offers the following evidence in support of its motion and in opposition to Plaintiffs' motion: (1) the Commitment Order in the criminal matter against Plaintiff Thomas issued May 17, 2005; and (2) a declaration of Captain John H. Clark. Both parties have also submitted excerpts of the depositions of Plaintiffs Thomas and Gipson, which have been lodged with the Court.

### 1. *Information Provided by Captain John H. Clark*

Captain Clark has stated both that floor-sleeping was a daily occurrence, and that on some days no inmate slept on the floor. This contradictory recollection raises the question of whether a genuine issue of material fact has been created about the existence of daily floor-sleeping, which could preclude summary adjudication.

After reviewing his various testimony. The Court finds that Captain Clark's inconsistent statements do not create a genuine issue of material fact.

In his deposition, Captain Clark stated that Men's Central Jail ("MCJ") has floor sleepers. (Clark Dep. 19:6–11, March 11, 2005.) He testified that the number of floor sleepers varies "depending on the population as it moves in and out of our jail," but agreed that "from late August— very late August 2004 to date [ ] the number of floor sleepers *on any given day* ranges between 35 and 500." (*Id.* at 19:17–19; 20:20–24) emphasis added. However, in a subsequent declaration attached to Defendant's opposition to Plaintiffs' motion for summary adjudication, Captain Clark states:

> "[T]here are days when *all* inmates are afforded a bunk upon which to sleep. On those occasions when some inmates are not afforded a bunk, there are typically between zero and 300 such inmates."

(Clark Decl. ¶ 4 (emphasis in original).)

 . "[A]n affidavit submitted in response to a motion for summary judgment which contradicts earlier sworn testimony without explanation of the difference does not automatically create a genuine issue of material fact." *Scamihorn v. Gen. Truck Drivers,* 282 F.3d 1078, 1086 n. 7 (9th Cir.2002). While "minor inconsistencies that result from an honest discrepancy, a mistake, or newly discovered evidence afford no basis for excluding an opposition affidavit,", a "sham" contradiction will not preclude summary judgment. *Id.* (internal quotation marks omitted).

 The Court finds that Captain Clark's statement in his declaration that on some days there are no floor sleepers in MCJ is a "sham" contradiction, in that it is

mate interests of the state." *Mink,* 322 F.3d at 1120–21.

an attempt to avoid summary judgment by creating an issue of fact rather than to clarify his testimony. In his deposition, Captain Clark stated that counts of floor sleepers are taken each day at MCJ and that the lowest number of floor sleepers he could recall on any such daily count was thirty five. Captain Clark's declaration does not clarify this statement, but rather "flatly contradicts" it. *See Kennedy v. Allied Mut. Ins. Co.*, 952 F.2d 262, 267 (9th Cir.1991). The Court does find, however, that the portions of Captain Clark's declaration in which he discusses the population at MCJ and the reason for floor-sleeping clarify and supplement his prior deposition. Accordingly, while those statements will be considered, the Court will disregard Captain Clark's statements that on some days during the relevant period there were no floor sleepers.

### 2. *Summary of Floor Sleepers Compiled by Plaintiffs' Counsel from Records Provided by Defendant*

On May 17, 2005, the Court certified the class in this case and ordered Defendant to "maintain records that identify by full name and booking number each person who was required to sleep on a floor, with or without bedding. The record for each person shall also include the date, time and location for each occurrence." (Class Cert. Order 15.) On July 1, 2005, the Court ordered Defendant to produce to Plaintiffs copies of any and all records that it had maintained in compliance with the May 17 Order and to supplement the production at regular intervals. (*See* Prod. Order, July 1, 2005.)

From those records, Plaintiffs' counsel compiled summaries of floor sleepers in six LASD facilities during the period May 29, 2005, to September 29, 2005 ("Floor Sleeper Summaries").[4] The first summary lists 24,688 instances where individuals were required to sleep on the floor.[5] The second summary lists 5,181 individuals who were required to sleep on the floor for more than one night. (*See* Pls.' Addit. Evidence.)

The majority of the inmates slept on the floor for between two and seven nights. For example, 2,523 individuals slept on the floor twice, 1,148 individuals slept on the floor three times, and 668 slept on the floor four times. (*Id.*) The incidence of floor-sleeping varies widely among the jail facilities. At the February 6, 2006 hearing on this motion, the Court ordered Defendant to file notice of any objections to the summaries. Defendant Baca has raised several objections to these summaries, and the Court addresses them in turn.

### i. *Factual Objections*

Defendant objects that the summary of repeat floor sleepers contains misspelled names and inaccurate booking numbers. (Def.'s Object. Floor Sleepers 6–7.) These are minor errors that do not impact the overall accuracy of the material. Defendant also argues that the summary contains an unspecified number of repeat entries and that one entry incorrectly indi-

---

4. On January 31, 2006, Plaintiffs submitted the full records that Defendant produced in response to the Court's May 17 and July 1 Orders. (*See* Floor Sleeper Summaries.) On February 9, 2006 and March 2, 2006, Plaintiffs submitted a summary of those individuals required to sleep on the floor for more than one night. (*see* Pls.' Tabulations of Repeat Floor Sleepers; Pls.' Addit. Evidence.)

5. Plaintiffs' initial summary listed 24,713 instances of floor sleeping. (*See* Floor Sleeper Summaries.) On March 2, 2006, Plaintiffs filed a corrected summary of repeat floor sleepers. Plaintiffs reduced the number of repeat floor sleepers by twenty-five, accordingly, the number of instances of floor sleeping considered by the Court is reduced by twenty-five.

cates that an inmate spent twenty-six nights rather than two nights on the floor. (*Id.*) Plaintiffs' counsel concedes that the actual number of repeat floor sleepers is 5,181 and not 5,206 as originally calculated. (Pls.' Reply to Def.'s Object. 7–9.) Further, Plaintiffs' counsel concedes that one entry incorrectly listed an inmate sleeping on the floor twenty six times. (*Id.* at 5–6.) Plaintiffs' counsel has submitted a corrected summary that does not contain any substantive inaccuracies.

### ii. *Rule 1006 Objection to Summary Exhibit*

■ Defendant argues that the summaries fail to satisfy the requirements of Federal Rule of Evidence 1006, which precludes the use of summaries when the underlying records (1) are not too voluminous to be conveniently examined in court; (2) are inadmissible; or (3) were not made available to the opposing party for inspection. *See Amarel v. Connell*, 102 F.3d 1494, 1516 (9th Cir.1996). This contention is without merit.

First, the Court finds that the underlying records of thousands of instances of floor-sleeping over the course of four months in multiple LASD jail facilities are too voluminous to be conveniently examined.

Second, the underlying records upon which the summary exhibit is based are admissible in evidence. Defendant objects that the underlying records are inadmissible hearsay under Federal Rules of Evidence 803 and 804. (Def.'s Obj. Floor–Sleepers at 5.) However, the underlying records were prepared by Defendant and disclosed to Plaintiffs pursuant to the Court's order. (*See* Class Cert. Order 15.) As statements made by and offered against Defendant, the underlying records are not hearsay. *See* Fed.R.Evid. 801(d)(2) (providing that a statement is not hearsay if it is offered against a party and

is "(C) a statement by a person authorized by the party to make a statement concerning the subject, or (D) a statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship"). Accordingly, the objection is overruled.

Defendant further objects that the records of floor sleepers between May 28, 2005 and September 29, 2005 are inadmissible as irrelevant because class membership dates from December 18, 2002 to May 17, 2005—prior to the records in question. (Def.'s Obj. Floor–Sleepers 2; *see also* Order Denying Pls.' Mot. Class Notif.)

■ Although the incidents of floor-sleeping referred to in the summary exhibit occurred after the class period closed, " 'post-event evidence' may be used to prove the existence of a municipal policy in effect at the time" of the alleged constitutional violation, and indeed "may be highly probative with respect to that inquiry." *Henry v. County of Shasta*, 132 F.3d 512, 519 (9th Cir.1997), *as amended on denial of rehearing*, 137 F.3d 1372 (9th Cir.1998). In the instant case, evidence that over 24,000 instances of floor-sleeping occurred in the four month period immediately following the close of the class is "highly probative" as to the likelihood that the practice was similarly in place during the class period.

Third and finally, Defendant's objection that the underlying materials were not made available to Defendant is overruled because the underlying materials belong to Defendant. Accordingly, the Court finds that the summary exhibit satisfies Federal Rule of Evidence 1006.

### 3. *Declaration of Plaintiff Thomas*

Defendant objects to a number of paragraphs within Plaintiff Thomas's Declaration of August 28, 2006. ( *See* Decls. and

Exs. in Opp. to Mot. Sept. 11, 2006 ("Decls. & Exs."), Thomas Decl. 4–7.) Defendant objects to each paragraph, except the first, on the grounds that it either· lacks founda-tion, is inadmissible hearsay, is vague and ambiguous, or irrelevant. (Def.'s Obj., Oct. 6, 2006, 6–8.) These objections are overruled. Defendant further objects to paragraphs 25 through 31 on the grounds that they concern an incarceration that is not alleged in the operative pleading and is therefore irrelevant. (Id.).

 As alleged in the Third Amended Complaint ("TAC"), during the relevant period Thomas was incarcerated once, from May 17, 2004 to June 23, 2004. (TAC ¶ 15.) Defendant contends that Thomas was a post-conviction prisoner, rather than a pretrial detainee during ·that incarcera-tion. (Def.'s Mot. at 6.) Thomas concedes he was a post-conviction prisoner during that period. (Thomas Dep. 11–22.) How-ever, he also raises for the first time a previous occasion during which he was forced to sleep on the floor of a LASD facility while he was a pre-trial detainee in March of 2003. (See Pls.' Stmt. of Genuine Issues 2 ("Plaintiff Thomas also previously was incarcerated at the LASD Jail in March 2003 as a pretrial detainee ....").) The Court finds that Plaintiff Thomas's reference to his 2003 detention is irrele-vant because it was not alleged in the operative pleadings.

As such, the Court grants Defendant's motion to strike paragraphs 25 through 31 of Plaintiff Thomas's declaration and con-siders Plaintiff Thomas to have been · a post-conviction inmate at all times relevant to the instant case.

### 4. *Declarations of Inmates Regarding Floor Sleeping*

#### i. *1,150 Declarations of Floor Sleepers*

Plaintiffs submitted 1,150 declarations of persons who alleged they were forced to sleep on the floor of various LASD facili-ties. (Evid. in Support of Pls.' Mot., April 3, 2006.) Defendant objects to a number of declarations.

#### a. *Irrelevancy*

 Defendant objects to 56 declara-tions as irrelevant because they contain allegations unrelated to floor-sleeping. In fact, the majority of these declarations de-scribe in detail the conditions in which the declarants were required to sleep on the floor. · To the extent that the declarations describe general conditions of confinement that existed . in combination with floor-·sleeping—such as the existence of staphy-lococcus infections, overflowing toilets, ver-min infestations, overcrowded cells, violent fights over which inmate would receive a bunk, etc.—those allegations are admissi-ble. *See Wilson*, 501 U.S. at 304, 111 S.Ct. 2321 (noting that the totality of the condi-tions of confinement may in combination establish a constitutional violation "when they have a mutually enforcing effect that produces the deprivation of a single, iden-tifiable human need"). To the extent, however, that a number of declarations include allegations unrelated to floor-sleep-ing, such as denial of medical care, retalia-tion by jail officials, and food poisoning, to name a few, such allegations are not rele-vant to the instant case and are not admis-sible.

#### b. *Vague and Ambiguous*

 Defendant objects to 87 declara-tions on the grounds that they are imper-missibly vague and ambiguous because "[t]he declarants cannot identify the specif-ic dates or·lengths of time for which they purportedly slept on the floor." (Def.'s Obj. 8–11, April 27, 2006.) Whether these declarants remember the exact dates they slept on the floor is immaterial to the declarations' admissibility. The allegation that an inmate slept on the floor of an

LASD facility, even without mention of the dates and length of time, is probative on the existence of a custom of floor sleeping.

### c. *No Allegation of Floor Sleeping in LASD Facilities*

■ Upon the objection of Defendant, the Court strikes the declarations of Stephen Razo, Edward Reed, Ricky Saldenas, and Lawrence Johnson because they do not state that the declarant was required to sleep on the floor or do not allege floor-sleeping in an LASD facility. Insofar as these declarations are admitted to establish the existence of a custom of floor-sleeping, the Court will only consider the declarations to which Defendant has not specifically objected. The 74 declarations that allege physical injuries or harm that resulted from floor-sleeping are not admissible to prove that the declarants' injuries were caused by floor-sleeping. However, they are admissible to show that certain illnesses, staphylococcus infections in particular, occur within the Los Angeles County jail system.

### B. *Existence of a Custom of Floor Sleeping*

■ Plaintiffs contend that their evidence establishes that no reasonable jury could find that a custom of floor did not exist in the Los Angeles County jail system during the class period.[6] The Court agrees.

A custom is a "longstanding practice ... which constitutes the standard operating procedure of the local government entity." *Menotti v. City of Seattle*, 409 F.3d 1113, 1151 (9th Cir.2005)(internal citation omitted). "Isolated or sporadic incidents" are

insufficient to establish liability; an "improper custom ... [must be] founded upon practices of sufficient duration, frequency and consistency that the conduct has become a traditional method of carrying out policy." *Id.; cf. Meehan v. County of Los Angeles*, 856 F.2d 102, 107 (9th Cir. 1988)(two incidents are not sufficient to establish a custom).

Plaintiffs have presented evidence that, according to Defendant's own records, over 24,000 instances of floor sleeping throughout the Los Angeles County jail system occurred in just a four month period. (Pls.' Add'l. Evid. 2–3, Jan. 17, 2006.) In addition, 885 individuals submitted declarations that documented their floor sleeping ordeals at LASD facilities. According to the deposition of Captain Clark, on any given day in Men's Central Jail alone there are anywhere from thirty five to 500 floor sleepers. (Clark Dep. 20:6–12, March 11, 2005). Other LASD officials saw inmates lying on the floor of the Inmate Reception Center ("IRC") between April 2004 and January 2005, (Decls. and Exs., Ex. 10, Yim Decl. 12:10–13:10), and explained that if an inmate admitted to the IRC does not complete processing by nighttime, he is not moved to a bunk until he is permanently housed unless he has medical or mental health issues, (*id.* Ex. 11 at 143, Klugman Dep. 32:15–23). A different LASD official, Captain Cornell, confirmed in a letter that floor-sleeping is "a necessary result of temporary insufficient bed space to accommodate every inmate." (Pls. Add'l Brief. on Mot., Ex. 2, March 6, 2006.)

---

**6.** Indeed, Plaintiffs urge the Court to apply a presumption that a custom of floor-sleeping exists. In *Thompson v. City of Los Angeles*, 885 F.2d 1439 (9th Cir.1989), the Ninth Circuit applied a presumption that there was a custom of floor-sleeping in the Los Angeles County jail system because such a custom had been found to exist just seven years earlier in *Rutherford v. Pitchess*, 457 F.Supp. 104 (C.D.Cal.1978). At present, however, because nearly eighteen years have elapsed since *Thompson*, the Court will not presume that a custom of floor-sleeping persists.

The class representatives provide vivid examples of when and how floor-sleeping occurs in LASD facilities:

Plaintiff E.L. Gipson was a pre-trial detainee while in LASD custody and therefore represents class members who were pre-trial detainees when they were forced to sleep on the floor. Plaintiff Gipson has, at various times, been in custody at several LASD jail facilities, including the Twin Towers Correctional Facility, Men's Central Jail, and the Pitchess Detention Center. Gipson's deposition reveals that from the moment he was admitted to Twin Towers in 2004, he was forced to sleep on the floor.

While being processed, Gipson was held in a holding cell with approximately 200 other inmates for approximately forty-eight hours. (Gipson Dep. vol. I, 77:15—78:79.) Within the holding cell, there were twenty benches, each of which could seat ten people, but no place to sleep. (*Id.* 78:10–16.) As a result, Gipson and the other inmates were forced to lie down on the floor to sleep. (*Id.* 80:18.) After spending forty-eight hours in that holding cell, Plaintiff Gipson stated that he was moved to a second cell, "maybe 10 by 20, . . . [where there were] people laying down like snakes huddled all up together trying to get rest because they're tired from being up for 48 hours or whatever." (*Id.* 82:14–22.)

Plaintiff Gipson explained that after spending several hours in that cell, he was taken to a third, virtually identical cell where he was held for twenty-four to forty-eight hours, again without a bunk. (*Id.* 84:2–23.) Once Gipson was eventually moved to a module, he was assigned to a day room without a bunk on which to sleep. (*Id.* 85:24—87:3.) When he arrived, the only available place for him to place his mattress was on the floor directly under the staircase. (*Id.* 87:4–9.) On yet another occasion, Gipson was required to

sleep on the floor of a shower, where he was held along with sixty other inmates, none of whom were provided bunks or a bed. (*Id.* vol. 2, 177:25—179:16.)

During another incarceration in 2004 at Men's Central Jail, Gipson again was not provided a bunk and was forced to sleep on the floor. (*Id.* vol. I 112:1, 9–11.) He was placed in a six-man cell that was already filled to capacity when he arrived, such that he had no choice but to sleep on the floor. He described the cell as follows:

THE WITNESS: Okay. The cell is about 6 feet by 12 feet, I guess, or 8 feet by 12. It has six bunks and a toilet. And I had to sleep on the floor in that cell on a wet mattress that was by the toilet.

(*Id.* 111:12–25.)

The following excerpt from Plaintiff Gipson's deposition provides one of the most illuminating descriptions of the conditions in which inmates are forced to sleep on the floor:

[Plaintiffs' Counsel]: What conditions [in the jail] are you talking about?

. . . .

THE WITNESS: Okay. Five days of processing, . . . just sitting on benches until you fall off into—you're just so tired, you lay on the floor and you just wait and wait and wait. And you're laying down with—packed on the floor, cement, cold, with no blanket, nothing . . . and it's just 40 men in a 10–man day tank.

[Plaintiffs' Counsel]: What about at night?

THE WITNESS: It didn't matter if it was—you didn't know if it was day or night. It just didn't matter. You were just there until you fall out. And you have to rest. So you end up on the floor with 30 other guys . . . until you said you're not going to lay down on the

floor, but you just don't have a choice. You know, that breaks you. It makes you feel bad.

Q. How does that in particular make you feel bad?

A. Because, after that, you finally get processing [sic] and they send you to a dirty, nasty cell, a six-man cell or a five-man cell, and you're the sixth man, and you got to sleep under a bunk.

And you think about hurting somebody. You think about—you're bigger than that guy that's got a bunk, and you want to take him off the bunk and smash him down and take his bunk, but, you know, why you have to do this? Why should I have to go through that? You think about that, and it just tears you up inside.

And then you sleep on the floor and your back hurts and you're in pain ... You can't do nothing. You feel like you're just in a bad nightmare, like a— you know, they used to talk about prisons in other countries, but that's right here in Los Angeles County jail, the same conditions.

(*Id.* 52:19—54:12.) [7]

Plaintiff S.A. Thomas was a post-conviction inmate while in LASD custody and thus represents post-conviction inmates required to sleep on the floor. Plaintiff Thomas was also forced to sleep on the floor. In his declaration, Thomas described the following:

13. The day room was very crowded, and there was only about ten inches between my mattress and the mattress of another inmate.

14. The only place I could find to sleep was under a stairway leading up to a second tier which housed suicidal inmates.

(Decls. and Exs., Thomas Decl. 3:13–18.) [8]

Defendant acknowledges that floor sleeping occurred during the relevant period, but stresses that the vast majority of inmates have a bunk on which to sleep. (Def. Opp. to Mot. at 9.) Defendant Baca argues that if MCJ housed 5,400 inmates on a given day, and 300 slept on the floor, 94.4% of inmates would receive a bunk on which to sleep. (*Id.* 11) Therefore, Baca contends that "[w]hen the uncontroverted evidence demonstrates that a full 94.4% of inmates at Men's Central Jail sleep on a bunk in the worst case scenario, it would be improper to issue a ruling that suggests all inmates sleep on the floor." (*Id.* 14.)

The Court is not persuaded. Plaintiffs are not asking for a ruling that "all inmates sleep on the floor," nor does the law require such a showing in order to establish the existence of a custom. Plaintiffs have submitted sufficient evidence, based in important part on Defendant's own records, to prove that it is the " 'standard operating procedure' of the local government entity" to require inmates to sleep on the floor when there are insufficient bunks available, and that, over the period of relevant time, multiple inmates were denied bunks on a daily basis. *Menotti,* 409 F.3d

---

**7.** Although cleanliness and sanitation are not the focus of the instant inquiry, the Court notes that Gipson reported seeing vermin and roaches on a daily basis, (Gipson Dep. vol. I, 127:12–23), that the bedding he did receive was wet, (*id.* 113:9–10), and that he was forced to sleep in "molded and mildewed" rooms, (*id.* vol. 2, 177:25–179:16). He also developed a staphylococcus infection on his left heel during his ordeal that required hospitalization; Gipson believed he contracted the infection from the standing water on the floor of the cell in the area he was required to sleep. (*id.* vol. I, 114:18–118:25)

**8.** Like Gipson, Thomas reported unsanitary conditions suffered by floor sleepers; he also developed chronic back and shoulder pain during the period when he was forced to sleep on the floor. (Thomas Dep. 49:29, 52:9–15.)

at 1151. That the majority of inmates receive a bunk on which to sleep does nothing to rebut the consistency with which many inmates are forced to sleep on the floor, a practice that occurred as frequently as 24,000 times over the course of just four months. *See Thompson,* 885 F.2d at 1448–49 (holding that there was a rebuttable presumption of floor sleeping in LASD facilities because seven years earlier "the county jail was *often* not providing each inmate with a bed" (emphasis added)); *Anela v. City of Wildwood,* 790 F.2d 1063, 1069 (3d Cir.1986) (holding that city defendant could be held liable for custom of unconstitutional prison conditions, including floor-sleeping, where the evidence "revealed a longstanding condition that had become an acceptable standard and practice," and where the city "offered no evidence rebutting the absence of beds or mattresses"). Drawing all inferences in favor of Defendant Baca, the Court finds that no reasonable jury could find that a custom of floor-sleeping did not exist in the Los Angeles County jail system during the class period. *See Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. Accordingly, the Court grants Plaintiffs' motion for summary adjudication on the existence of a custom of floor-sleeping.

## C. *Constitutionality of Floor–Sleeping at LASD Facilities*

Plaintiffs seek summary adjudication of whether this custom of floor sleeping is unconstitutional. (*See* TAC ¶ 25; Reply 22.) The Court finds that the practice of requiring inmates to sleep on the floor of LASD jails violates the Eighth Amendment.

### 1. *Objective Prong—Floor Sleeping is Sufficiently Serious*

■ The Court finds that Defendant's custom of floor-sleeping is, objectively, a sufficiently serious deprivation of "the minimal civilized measure of life's necessities" to warrant protection by the Eighth Amendment. *Wilson,* 501 U.S. at 298, 111 S.Ct. 2321 (internal quotation marks omitted). With this conclusion the Court must, unfortunately, join in nearly thirty years of judicial recognition and condemnation of the practice in LASD facilities.

Judge William Gray first identified floor-sleeping at LASD facilities as unconstitutional in 1978. *See Rutherford v. Pitchess,* 457 F.Supp. 104 (C.D.Cal.1978), *aff'd in part and rev'd in part on other grounds,* 710 F.2d 572 (9th Cir.1983), *rev'd sub nom., Block v. Rutherford,* 468 U.S. 576, 104 S.Ct. 3227, 82 L.Ed.2d 438 (1984). In that case, a class of pre-trial detainees and post-conviction inmates challenged various conditions of confinement at Los Angeles County Central Jail, including the practice of floor-sleeping. The court concluded that it was "intolerable" that some inmates were "obliged to sleep on mattresses on the concrete floor of the cell or of the walkway that fronts a row of cells." *Id.* at 109. He explained that "[i]f the public ... finds it necessary to incarcerate a person, basic concepts of decency, as well as reasonable respect for constitutional rights, require that he be provided a bed." *Id.* (internal quotation marks omitted).[9]

---

9. The court did not expressly indicate whether its ruling hinged upon the Eighth or the Fourteenth Amendment. *See Rutherford,* 457 F.Supp. at 108 (quoting Supreme Court cases about both Amendments). However, the court's reliance on the Eighth Amendment "evolving standards of decency" language, as well its recognition that the class included post-conviction inmates—the conditions of whom are governed by the Eighth Amendment—suggests that its conclusion was at least in large part rooted in Eighth Amendment analysis. *See id.* (quoting language regarding the Eighth Amendment from *Trop v. Dulles,* 356 U.S. 86, 100, 78 S.Ct. 590, 2 L.Ed.2d 630 (1958)).

Eleven years later, the Ninth Circuit confirmed that floor-sleeping in LASD facilities could violate the constitution. *See Thompson v. City of Los Angeles*, 885 F.2d 1439 (9th Cir.1989). In that case, the court, relying on the findings in *Rutherford*, reversed the district court's grant of summary judgment in favor of the defendant, holding that the plaintiff's "uncontroverted allegation that he was provided with neither a bed nor even a mattress unquestionably constitutes a cognizable constitutional claim." [10] *Id.* at 1448.

Defendant Baca argues that *Thompson* is distinguishable because Plaintiffs here were generally afforded mattresses. The Court cannot agree. Nothing in the Ninth Circuit's reasoning hinged on the lack of a mattress, rather than the lack of a bunk. To the contrary, the court emphasized cases holding that "a jail's failure to provide detainees with a mattress *and* bed or bunk runs afoul of the commands of the Fourteenth Amendment." *Id.* (emphasis added) (citations omitted). The issue of whether floor-sleeping *with mattresses* is unconstitutional was not before the court in *Thompson*. Nevertheless, its reliance on *Rutherford*—which held unconstitutional the practice of forcing inmates to sleep *on a mattress* on the floor—suggests that the Ninth Circuit views floor-sleeping, with or without a mattress, as offending "basic concepts of decency, as well as reasonable respect for constitutional rights," *id.*, language that directly implicates the Eighth Amendment.

Following in the footsteps of this jurisprudence, the Court finds that requiring inmates to sleep on the floor deprives them of a minimum measure of civilized treatment and access to life's necessities because access to a bed is an integral part of the "adequate shelter" mandated by the Eighth Amendment. *Johnson*, 217 F.3d at 731. The "routine discomfort inherent in the prison setting" may not state a constitutional claim, *id.*, but depriving inmates of beds goes deeper. The Constitution clearly does not allow prisoners to suffer the deprivation of adequate food or water. *See id.* at 730 (identifying a cognizable constitutional violation when inmates alleged they were, *inter alia*, given "spoil[ed]" food and limited water for several days). Just so, prisons may not deprive those in their care of a basic place to sleep—a bed; for like wearing clothing, sleeping in a bed identifies our common humanity.

That many individuals, for cultural or health reasons, *choose* to sleep on the floor in no way detracts from this point. A predilection for camping under the stars or the soothing touch a hard futon may have on a sore back is entirely different in kind from stripping an individual of the option of using a bed. Quite simply, that a custom of leaving inmates nowhere to sleep but the floor constitutes cruel and unusual punishment is nothing short of self-evident.

The Court is not alone in finding that a minimum degree of civilized conduct *demands* such a conclusion. In *Lareau v. Manson*, 651 F.2d 96, 107–08 (2d Cir.1981) (emphasis added), for example, the Second Circuit affirmed the district court's ruling that "forcing men to sleep *on mattresses* on the floors" violates the Eighth Amendment because it does "not provide minimum decent housing *under any circumstances for any period of time.*" Similarly, the Third Circuit, in holding that a county's remedial plan to improve conditions in its jail would satisfy Eighth and Four-

---

**10.** Because that case dealt with a pre-trial detainee plaintiff, the court used Fourteenth Amendment, rather than Eighth Amendment, analysis. *Thompson*, 885 F.2d at 1448.

However, its reliance on *Rutherford* indicates that it may have questioned the constitutionality of the practice under the Eighth Amendment as well.

teenth Amendment requirements of adequate shelter if, *inter alia,* it provided inmates with "bunk-type beds of their own," characterized forced floor-sleeping, even with mattresses, as an "unsanitary and humiliating practice." *Union County Jail Inmates v. Di Buono,* 713 F.2d 984, 996, 1001 (3d Cir.1983); *see also Lyons v. Powell,* 838 F.2d 28, 30 (1st Cir.1988)(holding that floor-sleeping with mattress stated cognizable Fourteenth Amendment violation); *Anela,* 790 F.2d at 1069 (same, in light of *Lareau* and *Union County* ); *Albano v. Mitchell,* No. C 97–3781, 1998 WL 101743, at *1 (N.D.Cal. Feb. 24, 1998) (unpublished) (noting that allegations of floor-sleeping "may be sufficient to implicate denial of the minimum civilized measures of life's necessities"); *Loya v. Bd. of County Comm'rs,* No. CV 91–216, 1992 WL 176131, at *2 (D.Idaho May 4, 1992) (unpublished) (noting its own previous holding that "sleeping on the floor is constitutionally prohibited"); *Balla v. Bd. of Corr.,* 656 F.Supp. 1108, 1114 (D.Idaho 1987) (enjoining floor-sleeping and characterizing it as "dehumanizing, intolerable and certainly of no penological benefit"); *Capps v. Atiyeh,* 495 F.Supp. 802 (D.Or.1980)(holding that overcrowded conditions which led to prac-

tices including floor-sleeping violated the Eighth Amendment); *Stewart v. Gates,* 450 F.Supp. 583, 588 (C.D.Cal.1978) (holding floor-sleeping unconstitutional).[11]

The basic humanity inherent in providing access to a bed highlights the practice of forced floor-sleeping as one of the unconstitutional effects of prison overcrowding. While "[o]vercrowding itself is not a violation of the Eighth Amendment[, i]t can, under certain circumstances, result in specific effects which can form the basis for an Eighth Amendment violation." *Hoptowit v. Ray,* 682 F.2d 1237, 1248–49 (9th Cir.1982). This makes sense. Overcrowding is not itself the constitutional harm; it is merely the *reason* behind the harm. As the Ninth Circuit has emphasized, overcrowding "may dilute other constitutionally required services such that they fall below the minimum Eighth Amendment standards, and it may reach a level at which the shelter of the inmates is unfit for human habitation." *Id.* Forcing inmates to sleep on the floor stoops to that unconstitutional level.[12]

International guidelines support this basic right. *See, e.g., Roper v. Simmons,* 543 U.S. 551, 578, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005) (considering "international opin-

**11.** The Court is not persuaded by the decisions Defendant cites from other circuits summarily holding that floor-sleeping does not state a constitutional violation. *See, e.g., Mann v. Smith,* 796 F.2d 79, 85 (5th Cir.1986) (holding claim that floor-sleeping is unconstitutional was "meritless" because "Mann has cited no case holding that the Constitution requires elevated beds for prisoners, and we know of no source for such a right."); *Hamm v. DeKalb County,* 774 F.2d 1567, 1575 (11th Cir.1985) (upholding grant of summary judgment for the defendant without considering the detailed facts of the floor sleeping).

**12.** For this reason, the Court does not subscribe to an interpretation of the Eighth Amendment that protects only inmates who have suffered some external, physical harm as a result of the floor-sleeping. *See. e.g., Ra-*

*mirez v. City and County of San Francisco,* No. C 89–4528, 1997 WL 33013, at *7 (N.D.Cal. Jan. 23, 1997) (concluding that "courts limit relief to those cases in which inmates have suffered harm from sleeping on the floor"). It is the degradation inherent in the forced floor-sleeping itself that is the harm. *See Thompson,* 885 F.2d at 1448 (holding floor-sleeping to present a cognizable constitutional claim without mention of any external harm). Nevertheless, the Court cannot help but note that Plaintiffs in this case *have* presented evidence that they suffered significant external harm from the filthy conditions in which they were forced to sleep on the floor, including back pain requiring medical treatment, coughing from the dust and grime, staphylococcus infections, exposure to leaking sewage, and exposure to cockroaches and vermin. (Gipson Dep. 115:18–116:7, 121:7, 128:6–22.)

ion" in Eighth Amendment analysis); *Atkins v. Virginia*, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002) (same). For example, the United Nations Standard Minimum Rules for the Treatment of Prisoners, which contain guidelines regarding confinement conditions and set forth minimum acceptable prison conditions, provide that "[e]very prisoner shall, in accordance with local or national standards, *be provided with a separate bed,* and with separate and sufficient bedding which shall be clean when issued, kept in good order and changed often enough to ensure its cleanliness." *United Nations Standard Minimum Rules for Treatment of Prisoners,* E.S.C. Res. 663 C (XXIV), U.N. ESCOR, 24th Sess., Supp. No. 1, ¶ 19, U.N. Doc. E/3048 (1957) (amended 1977) (emphasis added); *see Lareau,* 651 F.2d at 106 (relying on these standards in assessing the meaning of "adequate shelter" and holding floor-sleeping unconstitutional).

Defendant asks the Court to excuse the existence of floor-sleeping because of the need to segregate prisoners for security reasons. (Def.'s Opp'n 9.) According to Defendant, because "an inmate of one classification cannot be indiscriminately placed with inmates of other classifications," certain individuals may be required to sleep on the floor even if a bunk is available with inmates of another classification. (Clark Decl. ¶ 9.) In other words, Defendant contends that the need to classify a large inmate population causes, and thereby justifies floor-sleeping. The Court disagrees.

Prisons have a legitimate interest in "maintain[ing] security and order at the institution," and they may impose restrictions that are reasonably related to that interest. *Bell v. Wolfish,* 441 U.S. 520, 540, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979). However, as explained, access to a bed is a fundamental human necessity under the Eighth Amendment. A restriction that violates that constitutional floor cannot possibly be reasonable. *See Johnson v. California,* 543 U.S. 499, 511, 125 S.Ct. 1141, 160 L.Ed.2d 949 (2005) (noting that "the integrity of the criminal justice system depends on full compliance with the Eighth Amendment" and that "[m]echanical deference to the findings of state prison officials in the context of the eighth amendment would reduce that provision to a nullity in precisely the context where it is most necessary" (internal quotation marks omitted)).

Further, were there sufficient bunks to accommodate all inmates once they are classified, inmates would not be required to sleep on the floor. In other words, Defendant's argument implies that floor-sleeping furthers an economic interest in housing more inmates without expending the resources necessary to increase the number of available beds. The Court cannot abide by such a rule. Allowing a cost defense to neutralize constitutional requirements would permit jails to maintain the most objectively abhorrent and inhumane conditions simply because eliminating them would require additional resources.

Of course, any inquiry into conditions of confinement "spring[s] from constitutional requirements and ... judicial answers to them must reflect that fact rather than a court's idea of how best to operate a detention facility." *Bell,* 441 U.S. at 539, 99 S.Ct. 1861. Los Angeles County Jail is the largest jail in the country. Providing the basic necessities of 19,500 inmates spread across eight custody facilities, numerous patrol stations, and at least 40 courthouses, as well as addressing serious medical, mental health, and security issues, is a complicated enterprise. Therefore, the Court understands that in the case of exigent circumstances, such as a "genuine emergency situation, like a fire or a riot," *Lareau,* 651 F.2d at 108, providing each inmate with a bed may be impossible. *See*

*Anderson v. County of Kern*, 45 F.3d 1310, 1314–15 (9th Cir.1995) (affirming denial of injunction that would have prevented prison officials from placing violent or suicidal inmates in "safety cell" without a bed for "short periods of time" in the face of evidence that such prisoners used objects, including beds, to harm themselves). However, while the Court has no desire to inject itself in the management of the jail, " 'federal courts [must nonetheless] discharge their duty to protect constitutional rights.' " *Rhodes v. Chapman*, 452 U.S. 337, 352, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981) (quoting *Procunier v. Martinez*, 416 U.S. 396, 405–06, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974)).

Accordingly, the Court holds as follows:

 In the absence of exigent circumstances, the objective prong of the Eighth Amendment requires LASD facilities to assign and provide each inmate with a bunk for the night immediately following the inmate's initial processing within the facility or transfer to a medical center or other place of screening or treatment, and for every night thereafter. Inmates must be processed within a reasonable amount of time. *See Vanke v. Block*, No. CV 98–4111, 2002 WL 1836305, at *1 (C.D.Cal. Aug. 8, 2002) (referring to an order that defendant LASD release those inmates entitled to release within "the period of time that is required to perform the administrative steps incident to release"), *rev'd on other grounds*, 77 Fed.Appx. 948 (9th Cir. 2003). A sudden, extreme rise in inmate population caused by an acute event, such as a civil disturbance, may affect the length of time that is reasonable for pro-

cessing.[13] However, overcrowding or regular classification considerations do not constitute exigent circumstances that would justify floor-sleeping. In general, the Court expects that processing, including any initial medical evaluation, should not take more than twenty-four hours, and, as technology improves, the time should decrease.

### 2. *Deliberate Indifference*

 Having found that Defendant has established a custom of floor-sleeping in LASD facilities, and that forced floor-sleeping falls below the Eighth Amendment's minimum standards of decency, the subjective "deliberate indifference" prong follows easily. Defendant undeniably knew of the practice; not only does it acknowledge that floor-sleeping occurs (arguing instead that its frequency does not constitute a custom or violate the Eighth Amendment's objective prong), but it is in large part Defendant's own records that convinced the Court of the custom's existence. It is not necessary that Defendant intended to cause Plaintiffs harm. *See Hearns*, 413 F.3d at 1040. Indeed, the Court believes that Defendant would prefer to avoid floor-sleeping. Nevertheless, there is no genuine issue of fact as to whether Defendant had "actual knowledge of the risk" that inmates would be forced to sleep on the floor; that knowledge is sufficient to grant summary adjudication in favor of Plaintiffs. *Id.* at 1041 (holding that a "well-documented" string of violence that contravened the Eighth Amendment's objective prong was sufficient to show actual knowledge on the part of prison officials, and that actual knowledge would con-

---

**13.** *Cf. Hernandez v. Denton*, 861 F.2d 1421, 1435 (9th Cir.1988) (holding that a plaintiff who alleged that he "was forced to sleep on a sheet metal bunk without a mattress, for one night" did not state a cognizable constitutional violation but not discussing how long he was in processing or at what time of day or

night he entered the cell in question), *vacated on other grounds sub nom. Denton v. Hernandez*, 493 U.S. 801, 110 S.Ct. 37, 107 L.Ed.2d 7 (1989). *Hernandez* is further distinguishable because it is not a floor-sleeping case; the plaintiff in that case alleged a lack of bedding, not the lack of a bed.

**1219**

stitute deliberate indifference) (internal quotation marks omitted).

### 3. *Policy as the Moving Force Behind the Violation .*

 Plaintiffs must also show that Defendant's custom was "the moving force behind the deprivation of a constitutional right." *Long,* 442 F.3d at 1190. Because the injury—forced floor-sleeping—"would have been avoided" had Defendant changed its custom, *id.,* the Court finds this requirement met as well, and therefore concludes that Plaintiffs are entitled to summary adjudication that Defendant's custom violates the Eighth Amendment. Because the Fourteenth Amendment provides greater protection for inmates, the Court finds that the custom violates that portion of the Constitution as well.

### D. *Individual Capacity Claim: Qualified Immunity*

 The parties have filed cross-motions for summary adjudication of the issue of whether Sheriff Baca, in his individual capacity, is legally responsible for the custom of floor-sleeping. The Court rules in favor of Defendant.

Qualified immunity protects from civil liability government officials whose conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). A constitutional right is clearly established if "it would be clear to a reasonable [official] that his conduct was unlawful in the situation he confronted." *Saucier v. Katz,* 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). Although *Rutherford* and *Thompson* go far in establishing a clear right against floor-sleeping, *Thompson* involved an inmate who had neither bed *nor* mattress, and the court criticized that prison condition on Fourteenth Amendment grounds. Further, neither case speaks to the length of time LASD may allow inmates to wait to receive a bunk while still comporting with constitutional standards. Therefore, it was not unreasonable for Sheriff Baca to believe that the presence of a mattress cured any constitutional defect, and not to realize that floor-sleeping violated the Eighth Amendment as well as the Fourteenth. Accordingly, the Court finds that Sheriff Baca is entitled to qualified immunity and grants summary adjudication on that issue for Defendant in his individual capacity.

## IV. CONCLUSION

Based on the foregoing reasons, the Court grants in part and denies in part Plaintiffs' motion, and grants in part and denies in part Defendant's motion.

IT IS SO ORDERED.